## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUNDAY HINTON, on behalf of herself and
others similarly situated,
c/o The Public Defender Service
for the District of Columbia
633 Indiana Avenue, N.W.
Washington, D.C. 20004

Civil Action No. _____

                              Plaintiff,

        v.

DISTRICT OF COLUMBIA,
c/o Mayor and Office of the Attorney
General for the District of Columbia
400 6th Street, N.W.
Washington, D.C. 20001

                              Defendant.

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(equal protection, due process, and D.C. Human Rights Act claims for gender-identity and sex
discrimination and for unconstitutional conditions of confinement)

       Plaintiff Sunday Hinton, on behalf of herself and a class of similarly situated transgender

individuals who currently reside in a District of Columbia Department of Corrections (DOC)

housing unit that does not accord with their gender identity, or who will be detained in a DOC

facility in the future, alleges as follows:

### PRELIMINARY STATEMENT

1.  Under DOC's written policy, its decision whether to house a detained transgender individual

    in a men's or women's unit is presumptively based on their anatomy, unless the DOC's

    Transgender Housing Committee (THC), a committee tasked with evaluating the vulnerability

    and safety needs of transgender individuals, recommends otherwise and the warden approves.

1

2.  Since January 2020, the THC has not met. Functionally, then, for the past 16 months, transgender individuals in DOC custody have been assigned housing based *solely* on their anatomy. DOC's Office of the General Counsel has confirmed that the policy is now applied in this manner.

3.  Furthermore, even when the THC does meet, it is not clear that the THC actually can override the DOC's presumptive placement based on anatomy.

4.  DOC's demeaning policy violates transgender individuals' rights under the U.S. Constitution and the District of Columbia Human Rights Act by discriminating on the basis of gender identity and sex and by exposing transgender individuals to heightened risk of sexual violence.

5.  Plaintiff Sunday Hinton, a transgender woman, came into DOC custody on April 26, 2021, and was automatically assigned to a men's housing facility under DOC's policy. Despite informing DOC officials of her gender identity and requesting to be transferred to the women's unit, she remains incarcerated in a men's unit more than two weeks later.

6.  Ms. Hinton seeks immediate, emergency relief to prevent DOC from continuing to house her in a men's unit, where she is at risk of sexual violence as a transgender woman. She seeks immediate transfer to the general population women's unit in accordance with her identity as a woman.

7.  Because DOC's unconstitutional policy exposes every transgender individual in its custody to discrimination, degradation, and risk of sexual violence, Ms. Hinton seeks, on behalf of a class of similarly situated individuals, a court order that: strikes down DOC's unlawful focus on anatomy as the touchstone for its housing decisions regarding transgender individuals; requires that DOC use gender identity, not anatomy, as the default basis for housing assignments; requires DOC to provide every transgender individual a prompt THC hearing; requires all

currently detained transgender individuals to be promptly re-housed in accordance with their gender identity; and requires DOC to implement THC recommendations on housing assignments so that each person is housed as safely as possible and without discrimination.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this action presents federal questions and seeks to redress the deprivation of rights under the Fifth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

9. Plaintiff's claims under the statutory law of the District of Columbia arise from the same events as the constitutional claims and are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because all of the events or omissions giving rise to this action occurred, and continue to occur, in this District.

## PARTIES

11. Plaintiff Sunday Hinton is a resident of the District of Columbia. She is transgender woman currently in the custody of the DOC at the Central Detention Facility, a men's facility, where she is at risk of imminent harm. She is being held in pretrial custody and is presumed innocent.

12. Defendant District of Columbia is a municipal corporation, the local government of Washington, D.C. It operates and governs the DOC pursuant to the laws of the District of Columbia. The District acted through its agents, employees, and servants in this case.

## FACTUAL ALLEGATIONS

### DOC's Transgender Housing Policy

13. Effective January 18, 2018, DOC Policy 4020.3F, titled "Gender Classification and Housing," establishes procedures for initial intake and housing assignments for transgender and intersex

individuals in DOC custody. The policy tasks the THC with recommending appropriate

housing assignments for transgender and intersex individuals in DOC custody, subject to the

final decision of the warden and the director of DOC.

14. DOC Policy 4020.3F is an official policy of the District of Columbia as carried out through

the Department of Corrections.

15. The policy establishes a default presumption that transgender individuals in DOC custody will

be housed according to their anatomy, not their gender identity. Specifically, the policy states:

"DOC shall classify an inmate who has male genitals as a male and one who has female genitals

as a female, unless otherwise recommended by the [THC] and approved in accordance with

this policy."

16. The policy provides that, upon initial intake, staff shall make a "determination of gender" of a

transgender individual whose "gender-related expression, identity, appearance, or behavior

differs from their sex at birth," by either (1) "inmate verification" (i.e., reviewing "commitment

documents for gender assignment or any notification that identifies the inmate as transgender

or 'vulnerable'"), or (2) determination of their "genital status" through a medical interview, by

reviewing medical records, or, if necessary, a medical exam by a medical practitioner. Any

individual who refuses to undergo a "complete physical examination" is placed in protective

custody. The intake staff must then document an individual's transgender status, their gender

identity, and their "apparent biological gender."

17. After the initial intake process is completed, the policy requires detained transgender

individuals to be "housed in a single cell in the intake housing unit consistent with the gender

identified at intake for no more than seventy-two (72) hours . . . until classification and housing

needs can be assessed by the [THC]." Because of the default presumption, every

4

transgender individual in DOC custody is housed—in an intake unit or otherwise—according to their anatomy until the THC meets. The policy does not make clear whether the THC must meet or make a recommendation on housing within the 72-hour timeframe.

18. The THC is comprised of a DOC social worker; a medical practitioner; a mental health clinician; a correctional supervisor; a Chief Case Manager or designee; and a DOC-approved volunteer who is transgender and experienced and knowledgeable about transgender issues or an acknowledged expert in trans affairs.

19. Under the policy, the THC must hold a hearing to assess a transgender individual's vulnerability and determine the appropriate housing assignment, unless the individual waives their right to a hearing and requests to be housed according to their sex assigned at birth.

20. The regulations implementing the federal Prison Rape Elimination Act (PREA) establish procedures for determining housing assignments for transgender individuals to protect them against sexual victimization. 28 C.F.R. § 115.42. Under PREA, which DOC cites as an authority in its policy, DOC must "make individualized determinations" about safety and must "consider on a case-by-case basis whether a [housing] placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." Moreover, DOC must give "serious consideration" to a transgender individual's "own views" on their safety.

21. DOC's policy provides that transgender individuals "will be classified and assigned housing based on their safety/security needs, housing availability, gender identity, and sex at birth." As part of assessing a transgender individual's vulnerability, the THC reviews all "records and assessments, including an interview with the inmate." The THC must also "ask the inmate his or her own opinion of his or her vulnerability in the general jail population of the male or

female units," and the policy provides that "[t]his information shall be taken into consideration in determining the proper housing assignment."

22. The THC decides on a housing assignment based on consensus or majority vote. A written decision is then forwarded to the warden for approval. The THC's housing assessment must also "address whether the inmate will be housed in the general population or in a protective custody unit of the gender consistent with their gender identity or sex at birth." If it is determined that a detained individual will be housed in the general population, they shall be housed in a single cell or with another transgender or intersex individual, "no exceptions." If it is determined that a transgender individual will be placed in protective custody, the policy notes that they may be placed in communal protective custody pursuant to the THC's determination. If the warden's opinion differs from the recommendation of THC, the warden shall explain the housing assignment in writing to the director, who then makes the final determination.

23. Upon information and belief, the THC's recommendations do not in practice lead to the housing of transgender individuals in accordance with their gender identity when it differs from their anatomy.

24. Indeed, according to a member of the THC, even when the THC does meet, the THC does not override the anatomy presumption, leading to people being housed according to their genitals rather than their gender identity.

25. The THC has not met since January 2020. Accordingly, transgender individuals in DOC custody do not receive individualized housing determinations.

26. As a result, according to an attorney from DOC's Office of the General Counsel, DOC currently determines housing assignments for transgender individuals based *solely* on their

anatomy. If a detained transgender woman is deemed "anatomically male," for example, she will be housed in a men's unit regardless of her gender identity as a woman.

**Sunday Hinton's Housing**

27. On April 26, 2021, Plaintiff Sunday Hinton was detained pretrial during her first appearance in D.C. Superior Court and confined to DOC custody on allegations of unarmed burglary with the intent to steal twenty dollars.

28. Although Ms. Hinton is a transgender woman and the Superior Court Lockup List listed her as "female," Plaintiff is being housed in a men's unit by DOC.

29. Michelle Wilson of the DOC's Office of the General Counsel informed Ms. Hinton's public defender, Rachel Cicurel, who is also one of Ms. Hinton's attorneys in this action, that Ms. Hinton would be housed according to her "anatomy." Ms. Wilson also asked Ms. Cicurel if Ms. Hinton had "male parts" and insisted that if Ms. Hinton is "anatomically male," she could only be housed in the men's general population or protective custody within a men's unit.

30. Ms. Cicurel called Traci Outlaw, a member of the THC, to see if Ms. Hinton could be transferred to a women's unit.

31. Ms. Outlaw informed Ms. Cicurel that the THC has not met since January 2020.

32. Ms. Outlaw also stated that when the THC does meet, the criteria it considers in determining if an individual should be housed according to "their sex assigned at birth or their gender expression" include (1) whether the individual has had "full [gender] reassignment surgery," and (2) whether the individual has ever been in a "heterosexual relationship."

33. Ms. Outlaw also confirmed that a person's anatomy is a primary focus of the THC's analysis when deciding where to house them. She stated that, for example, a transgender man who came to the jail after taking hormones, with a full beard, was not housed in a men's unit, despite his

wishes to be housed with the men, because he still had a "functioning vagina." If he had a "menstrual cycle" while at the jail, Ms. Outlaw stated, "he could not change his pad" while sharing a cell with a man. She also stated that if a transgender woman had not undergone full gender reassignment surgery but had previously been in a heterosexual relationship, it would be particularly concerning if the transgender woman ended up in a women's unit with a "working penis."

34. When Ms. Cicurel inquired if Ms. Hinton could be housed in a women's unit, Ms. Outlaw explained that "even if everyone on the THC agrees that a person is best off" housed in a unit consistent with that person's "gender expression," the housing decision is ultimately up to the warden. And even if the warden agrees that the transgender woman should be housed in a women's unit, Ms. Outlaw continued, the transgender woman must be "secluded" from the other women.

35. Ms. Hinton is a transgender woman and identifies as a woman. She wishes to be housed in a general population women's unit, in accordance with her gender identity.

36. She would feel safer in a women's unit than in the men's unit because she knows that transgender women in men's unit are at risk of sexual violence, including assault or rape. Transgender individuals, especially transgender women housed with men, bear a high risk of sexual harassment and assault in penal institutions.

37. Additionally, the men's units are more dangerous than the women's units because there are significantly more incidents of violence in the men's units.

38. Ms. Hinton has asked to be moved to a general population women's unit in accordance with her identity as a woman.

39. Being housed in a protective custody unit is not a viable alternative for Ms. Hinton. Conditions in protective custody are uniformly worse than in the general population, even during the lockdown currently in place at DOC facilities. Individuals in protective custody are segregated from others and stripped of access to many services, like classes, group therapy, and drug education. Protective custody is functionally equivalent to solitary confinement, a practice that results almost universally in symptoms such as intense anxiety or panic attacks, disordered thinking, problems sleeping, problems with concentration and memory, despair, and repetitive acts such as pacing, cleaning, and counting. Placing a transgender woman in solitary confinement puts her at grave risk of suicide.

40. Confinement in protective custody would negatively impact Ms. Hinton's mental health, subjecting her to extreme isolation and making it even more difficult to deal with her anxiety. She may be confined there for a year or more as she awaits trial. A protective custody "solution" would mean that transgender individuals like Ms. Hinton are forced to choose between being housed in a unit inconsistent with their gender identities or solitary confinement.

## CLASS ALLEGATIONS

41. Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiff brings two claims in this action on behalf of a class consisting of all transgender individuals who currently reside in a DOC housing unit that does not accord with their gender identity, or who will be detained in a DOC facility in the future. Plaintiff reserves the right to amend the class definition or establish sub-classes as appropriate if discovery or further investigation reveals the class should be expanded or otherwise modified.

42. Numerosity: The class is so numerous that joinder is impracticable. On information and belief, approximately 40 to 60 transgender people are currently housed in DOC custody, with the vast

majority, if not all of them, housed based on their sexual anatomy rather than their gender identity. Joinder is impracticable because the class includes unnamed, future class members who by definition cannot be counted and joined. Further, proposed class members are highly unlikely to file individual suits on their own, as many of them are indigent, have limited access to their retained or court-appointed counsel because of restrictions put in place by DOC in response to the COVID-19 pandemic, are currently incarcerated, fear retaliation from filing suits against Defendant, and lack access and financial resources to obtain qualified counsel to bring such suits.

43. <u>Commonality</u>: The claims of the class share common issues of law, including but not limited to whether Defendant's policy regarding housing of transgender individuals—a policy that systemically affects all proposed class members from the moment they enter into DOC's custody—violates equal protection and/or the District of Columbia Human Rights Act. The resolution of these questions will drive the outcome of the litigation.

44. <u>Typicality</u>: The claims of Plaintiff are typical of those of the class as a whole, because Plaintiff is currently in the District's custody and is subject to the same policy as the proposed class members.

45. <u>Adequacy</u>: Plaintiff is an adequate class representative who meets all the requirements of Rule 23(a)(4). She has no conflicts of interest in this case with other class members. She will fairly and adequately represent the interests of the class and understands the responsibilities of a representative. Among counsel for Plaintiff are attorneys with extensive experience with the factual and legal issues involved in representing individuals in jail and prison, in asserting constitutional rights, and/or in pursuing class actions. Counsel will vigorously pursue the interests of the class.

## CAUSES OF ACTION

### Claim 1: Fifth Amendment Equal Protection (via 42 U.S.C. § 1983)
(Plaintiff Sunday Hinton and proposed class members)

46. The Fifth Amendment guarantees equal protection of the laws to persons in the District of Columbia.

47. DOC is violating Ms. Hinton's and proposed class members' equal protection rights because its policy of considering anatomy as either the default or the exclusive criterion in housing assignments for transgender people results in unequal treatment of transgender individuals as compared to cisgender individuals on the basis of their gender identity and sex.

48. DOC's focus on transgender individuals' genitalia for the purpose of assigning them to housing is not substantially related to any legitimate objective, much less an "exceedingly persuasive justification." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

49. As a result of DOC's unconstitutional actions, Ms. Hinton and proposed class members are suffering or are at imminent risk of suffering irreparable injury.

### Claim 2: District of Columbia Human Rights Act, D.C. Code § 2-1402.73
(Plaintiff Sunday Hinton and proposed class members)

50. The District of Columbia Human Rights Act prohibits "a District government agency or office" from "limit[ing] or refus[ing] to provide any facility . . . to any individual on the basis of an individual's actual or perceived . . . gender identity or expression." D.C. Code § 2-1402.73.

51. The Department of Corrections is a District government agency or office providing housing facilities to incarcerated individuals.

52. DOC is violating the D.C. Human Rights Act because its policy of considering anatomy as either the default or the exclusive criterion in housing assignments for transgender people limits or denies Ms. Hinton's and proposed class members' access to housing facilities based on their gender identities.

11

53. As a result of the DOC's unlawful actions, Ms. Hinton and proposed class members are suffering or are at imminent risk of suffering irreparable injury.

### Claim 3: Fifth Amendment Due Process Clause (via 42 U.S.C. § 1983)
(Plaintiff Sunday Hinton)

54. The Fifth Amendment guarantees individuals detained pretrial the right to be free from punitive conditions of confinement.

55. DOC is violating Ms. Hinton's Fifth Amendment due process rights by intentionally acting or recklessly failing to act with reasonable care to mitigate the risk posed by a condition of confinement even though DOC knows, or should know, that the condition poses an excessive risk to health or safety.

56. DOC's current policy of assigning all detained transgender individuals to housing units based on their anatomy as the default or sole criterion, without any individualized assessment of the individual's safety or gender identity, poses an excessive risk to Ms. Hinton's health and safety.

57. DOC knows, or should know, that its policy exposes Ms. Hinton to a heightened risk of sexual violence including sexual assault or rape.

58. DOC has acted intentionally or has recklessly failed to act with reasonable care to mitigate the risk to Ms. Hinton because DOC has continued to apply its policy and has even suspended the committee that could at least, in theory, enable Ms. Hinton to overcome the default presumption that puts her at risk.

59. As a result of DOC's unconstitutional actions, Ms. Hinton is suffering or is at imminent risk of suffering irreparable injury.

### RELIEF REQUESTED

WHEREFORE, Plaintiff and proposed class members respectfully request that the Court:

A. Enter a temporary restraining order requiring Defendant to transfer Plaintiff Sunday Hinton to a general population women's housing unit as soon as possible;

B. Certify the proposed class, designate Plaintiff as the Class Representative, and designate Plaintiff's counsel as Class Counsel;

C. Declare that Plaintiff's and class members' Fifth Amendment rights to equal protection and due process, and their rights under the District of Columbia Human Rights Act, have been violated;

D. Enter a preliminary injunction requiring Defendant to:

   a. Cease its policy of using an individual's anatomy as the default or sole criterion in making housing assignments for transgender individuals in DOC custody;

   b. House every transgender individual, upon initial intake into a DOC facility, in an intake housing unit corresponding to their gender identity;

   c. Provide to every transgender individual in DOC custody a Transgender Housing Committee hearing, which may be virtual or telephonic, within 72 hours of the individual's intake, or within 72 hours of any other time at which the individual's transgender status becomes known to any DOC staff member;

   d. Ensure that each transgender individual currently in DOC custody is housed in accordance with the individual's gender identity and is promptly thereafter provided a Transgender Committee Hearing, which may be virtual or telephonic; and

   e. Implement any Transgender Housing Committee recommendation regarding an individual's housing assignment;

E. Award costs to Plaintiff and the class; and

F.  Grant Plaintiff such further relief as this Court deems appropriate.

May 11, 2021                           Respectfully submitted,

                                      /s/ Scott Michelman
                                      Scott Michelman (D.C. Bar No. 1006945)
                                      Megan Yan* (D.C. Bar No. 1735334)
                                      Marietta Catsambas* (D.C. Bar No. 1617526)
                                      Arthur B. Spitzer (D.C. Bar No. 235960)
                                      Michael Perloff (D.C. Bar No. 1601047)
                                      American Civil Liberties Union Foundation
                                         of the District of Columbia
                                      915 15th Street NW, Second Floor
                                      Washington, D.C. 20005
                                      202-601-4267
                                      smichelman@acludc.org


                                      /s/ Rachel Cicurel
                                      Rachel Cicurel* (D.C. Bar No. 1024378)
                                      Steven Marcus (D.C. Bar No. 1630882)
                                      Public Defender Service for the District of Columbia
                                      633 Indiana Avenue N.W.
                                      Washington, D.C. 20004
                                      Tel. 202-824-2774
                                      Fax 202-824-2776
                                      rcicurel@pdsdc.org

                                      *Counsel for Plaintiff*

---

* In accordance with D.D.C. Local Civil Rule 83.2(g), the attorneys whose names are marked with an asterisk above certify that: (i) they are members in good standing of the District of Columbia Bar; (ii) they are representing a petitioner who is indigent within the meaning of Local Rule 83.2(g), at no cost to petitioner; (iii) they have never been subject to disciplinary complaint or sanction by any court or other disciplinary authority; and (iv) they possess a copy of the Local Rules of this District and are familiar with the rules generally and as they pertain to this proceeding.