| | |
|---|---|
| SUNDAY HINTON, on behalf of herself and others similarly situated, <br><br>       Plaintiff, <br><br>  v. <br><br> DISTRICT OF COLUMBIA, <br><br>       Defendant. | No. 21-cv-01295 |

## PLAINTIFF'S REPLY IN SUPPORT OF HER MOTIONS FOR CLASS CERTIFICATION AND PRELIMINARY INJUNCTION

The crux of the Department of Corrections (DOC)'s opposition to preliminary injunctive relief and class certification is that the claims at issue are moot because Ms. Hinton was released from custody and because DOC's new Policy 4020.3H replaced the policy challenged in this case. But this Court retains jurisdiction over this case, should certify the class, and should issue the proposed preliminary injunction.

First, in spite of Ms. Hinton's release, claims on behalf of the class remain live under the "inherently transitory" exception to mootness, which fits the facts of this case perfectly.

Second, the new policy does not moot the class claims, either, because there is still effectual relief to grant. The new policy removes the presumption of housing transgender individuals based on anatomy but replaces it with a new discriminatory measure: requiring all transgender individuals to be housed in protective custody for the duration of intake. The new policy subjects transgender individuals to what is, in essence, solitary confinement—a characterization supported by numerous declarants and contradicted by none—solely because they are transgender. DOC cannot moot putative class members' claims by swapping one discriminatory practice for another. This isolating, punitive measure inflicted on the basis of gender identity continues to violate

1

putative class members' equal protection rights as well as the D.C. Human Rights Act ("DCHRA"). Moreover, while DOC's new policy states that transgender individuals will now be housed presumptively based on their preference, DOC's actions in this litigation show that this is a hollow promise in the absence of safeguards. At least four times in the two months since this case was filed, DOC officials have pressured transgender women into signing housing forms that signaled a "preference" to be housed with men, despite giving them no real choice. Plaintiff has urged this Court to enjoin such coercive tactics, ECF 19 (Pl.'s Supp. Br.), and the new policy does not address this requested relief—which remains live. In the alternative, this Court retains jurisdiction over the class claims because DOC has not carried its "heavy burden" to show there is no reasonable risk that it will revive its old policy, and it has not come close to eradicating the effects of its violation. Indeed, not only does discriminatory treatment continue (as noted), but DOC has not even provided all currently incarcerated transgender individuals with the hearings promised by its new policy or moved them out of the discriminatory housing placements implemented under the old policy. Thus, the "voluntary cessation" exception to mootness applies.

Virtually all of DOC's arguments opposing class certification and injunctive relief rely on its erroneous claim of mootness. The remaining points misconstrue Plaintiff's proposed claims or basic principles of class action law and are easily rejected. The Court should grant class certification and injunctive relief to protect the members of this vulnerable class from continued discrimination that will expose them to unfairly punitive and/or dangerous conditions and deny a fundamental aspect of their identity, in violation of their constitutional and statutory rights.

## SUPPLEMENTAL STATEMENT OF FACTS

On June 17, 2021, DOC adopted Policy 4020.3H, ECF 22-2 (hereinafter the "H Policy"), which superseded the prior transgender housing policy, ECF 22-1 (numbered 4020.3G; the "G

Policy"). The H Policy removes the presumptive anatomy-based assignment, as DOC notes, but it also imposes a new discriminatory measure: placing *all* transgender individuals in protective custody during an intake period that can last a week or more. Specifically, the policy requires (with no exceptions) that transgender individuals "shall be housed in protective custody (voluntary or *involuntary* protective custody) . . . in the intake housing unit," until the Transgender Housing Committee (THC) decides on their classification and the individuals are housed accordingly. H Policy § 10(a) (emphasis added). For the "duration of the intake process," a transgender individual is "treated as a protective custody" resident. *Id.* § 9(f). Cisgender individuals in the intake process do not receive this treatment.

All of the evidence before the Court regarding protective custody in DOC facilities—which comes from multiple unrefuted declarations—shows that protective custody is "*de facto* solitary confinement," ECF 4-3 (Chen Decl.) ¶ 7, in which individuals lack in-person interactions, are frequently shackled when leaving their cells, and receive just 1-2 hours per day out of their cells for all activities, including showers, commissary, recreation, and calls to family or friends. *Id.* ¶¶ 5, 7; *see* ECF 19-2 (Richardson Decl.) ¶ 6 ("I was not able to speak to anyone. I could not call my lawyer or my family. I asked the Jail for my mental health medication, to see a counselor, and to speak with a psychiatrist. Staff declined or ignored my requests . . . ").

Virtually *every* transgender declarant in this case named a fear of being placed in protective custody, a fear that prevented some of them from raising housing or safety concerns. Their statements show that protective custody is isolating and makes them feel punished for being trans:

- "I absolutely do not want to be housed in protective custody because it is extremely isolating. Being in protective custody is depressing. Being in protective custody would also impact my mental health by making it even more difficult for me to deal with my anxiety." ECF 4-7 (Hinton Decl.) ¶ 10.

- "I asked Ms. Outlaw what my other options were because I did not want to go to solitary confinement . . ." ECF 19-5 (Phillips Decl.) ¶ 6.

- "[Y]ou can't tell staff you're afraid to be raped by the men because they will put you in protective custody. . . . I do not want to go to protective custody. When you're in P.C. [protective custody], you're locked down all day long. And when you're moving around the jail, they put you in handcuffs around your ankles, around your waist, and to your wrists, and the correctional staff is always with you. I don't want to be chained up and locked up like some type of animal when I didn't do anything wrong." ECF 19-7 (Moorman Decl.) ¶¶ 16-17.

- "In protective custody, you're locked down, you're getting privileges taken away from you that you're not supposed to. And all because of my identity. I felt that I was being punished because of my identity . . . ." ECF 19-8 (Hines Decl.) ¶ 10.

- "In protective custody, you are treated like you are being punished. For me to maintain my mental health, I cannot be placed in protective custody. Protective custody puts a lot of stress of my mind. I remember being assaulted when the Jail promised I would be in a cell alone." ECF 19-2 (Richardson Decl.) ¶ 24.

- "I don't want to be in protective custody because they keep you in a cell for pretty much the whole day. You're supposed to come out for recreation, but you sometimes don't get that . . . . To be in protective custody is like being in the hole, or solitary confinement." ECF 19-10 (Robinson Decl.) ¶ 13.

Somehow missing this throughline, DOC replaced one harmful, discriminatory practice with another by requiring the imposition of protective custody on transgender individuals simply because they are transgender. By contrast, the regular intake unit, even during the pandemic, is "not solitary confinement" as residents are "allowed outside of [the] cell around other residents and staff, both inside . . . and outside [the] unit." ECF 15-1 (Supp. Hinton Decl.) ¶ 2.

Under the H Policy, protective custody for trans individuals may last a week or longer: First, they wait for a Prison Rape Elimination Act (PREA) assessment "within twenty-four (24) hours, *excluding weekends, holidays, and emergencies*"—meaning individuals who arrive early in a weekend will wait 72 hours (96 if it's a holiday weekend). H Policy § 10(a) (emphasis added). Next, transgender individuals wait for the THC to "conduct a formal classification and housing needs assessment" "within seventy-two (72) hours" of the PREA assessment, again "excluding

4

weekends, holidays, and emergencies." *Id.* This time limit is just for the THC's "assessment"; the policy imposes no deadline for the THC to reach a decision and for the individual to be moved from intake. So transgender individuals' time in protective custody will last 4 days, *plus* weekend days (which will necessarily extend either the PREA or THC time by 48 hours unless the individual arrives on a Monday), *plus* any holidays or "emergencies," *plus* an indefinite period for the THC to make a decision and for the individual to be transferred—all in *de facto* solitary confinement. All told, the H Policy imposes protective custody on trans individuals for up to a week, often more.

Under the new policy, DOC houses transgender individuals post-intake based on "their preference, unless otherwise recommended by the Transgender Housing Committee." H Policy § 2(a). But the new policy does not include the procedural safeguards that Plaintiffs have argued are necessary—notice and opportunity to consult with counsel prior to signing a Gender Housing Request Form or attending a THC hearing. ECF 19 (Pl.'s Supp. Br.) 11-13. The unrefuted evidence shows DOC that officials repeatedly pressured transgender individuals to sign forms indicating a "preference," *after* they were given no real choice. *See* ECF 15-1 (Hinton Supp. Decl.) ¶¶ 4-9; ECF 19-7 (Moorman Decl.) ¶¶ 13-16; ECF 19-6 (Watkins Decl.) ¶¶ 9-13; ECF 19-5 (Phillips Decl.) ¶¶ 5-8. The unrefuted evidence further reveals DOC officials' hostility to housing transgender individuals in accordance with their gender identity and their practice of indulging implausible factual assumptions to support their own prejudgments. *See* ECF 19-7 (Moorman Decl.) ¶ 5 (a THC member told her that "women could try to rape [her]" even though Ms. Moorman informed the THC member that she "ha[s] been castrated," "ha[s] . . . implants," "ha[s] had facial feminization done," and "had [her] Adam's apple scraped away"); ECF 15-1 (Hinton Supp. Decl.) ¶¶ 4-6 (after she explained that she could safely be housed with the women, DOC officials told her that she "could get sexually assaulted if [she] went into the women's unit" ); ECF 19-10 (Robinson

Decl.) ¶ 8 (DOC officials refused her request to be housed with the women, in part "because [she] was kind of on the cute side" and so "the women would rape [her]"); *see also* ECF 19-2 (Richardson Decl.) ¶¶ 13-15 (after she "told the committee that [she] needed to be housed with the women because [she] will be safer with the women" and signed a paper saying as much, the "Jail assigned [her] to be housed with the men" without any explanation); ECF 19-8 (Hines Decl.) ¶ 3 (she signed a form stating she wanted to be housed with women, but was never housed with women). DOC does not dispute any of this. Thus, the procedural safeguards Plaintiff seeks remain necessary to ensure that transgender individuals' preferences are expressed free of coercion.

A month after the H Policy was promulgated, the THC hearings it promises have not been provided for all transgender individuals in custody. None of Plaintiff's three prior declarants who were in DOC custody on June 17—Latisa Moorman, Courtney Phillips, and Jessica Watkins (all putative class members whose supplemental declarations are attached to this brief)—was assigned new housing, given a THC hearing, or even informed of the policy change by DOC. *See* Supp. Decl. of Latisa Moorman ¶¶ 2-3; Supp. Decl. of Courtney Phillips ¶¶ 3-7, 9; Supp. Decl. of Jessica Watkins ¶¶ 2-5. The H Policy requires THC hearings for any transgender individual who "makes known to DOC staff their Transgender . . . status," H Policy § 10(b). *See* ECF 19-7 (Moorman Decl.) ¶¶ 2-5; ECF 19-5 (Phillips Decl.) ¶¶ 4-7; Supp. Watkins Decl. ¶ 3.[1]

## ARGUMENT

### I.  The Claims In This Case Remain Live.

DOC's two asserted bases for mootness fail. First, notwithstanding Ms. Hinton's release from custody, the class claims persist under the "inherently transitory" exception to mootness. Second, in spite of the policy change, this Court retains jurisdiction over the class claims because

---

[1] Ms. Moorman was released from custody on July 9. Supp. Decl. of Latisa Moorman ¶ 2.

the Court can grant effectual relief against the H Policy which, like the previous G Policy, continues to discriminate against transgender individuals and lacks procedural safeguards this litigation has shown to be necessary. Alternatively, this Court retains jurisdiction over the class claims against the previous G Policy under the "voluntary cessation" exception to mootness.

### A. Ms. Hinton's release does not deprive the court of jurisdiction because of the "inherently transitory" exception to mootness.

Under the "inherently transitory" exception to mootness, claims of a class persist even after the named plaintiff's claim becomes moot. *J.D. v. Azar*, 925 F.3d 1291, 1307-08 (D.C. Cir. 2019). The claims here are quintessential "inherently transitory" claims; the exception was specifically crafted for "injunctive class actions challenging criminal and immigration detention procedures." *Id.* at 1308. A court must determine (1) "whether the individual claim might end before the district court has a reasonable amount of time to decide class certification" and (2) "whether some class members will retain a live claim at every stage of litigation." *Id.* at 1311. Both prongs are met here.

First, putative class members' claims "likely will, *or at least might*, end quickly," *id.* (emphasis added), because many class members may be released within weeks or months based on their respective criminal proceedings. For instance, Ms. Hinton's DOC custody lasted a month: from April 26, 2021 until May 26, 2021. ECF 18 (Notice of Release). Similarly, Star Parker, another transgender woman, was in DOC custody for two months: from April 5, 2021 until June 9, 2021. ECF 19-4 (Burrell Decl.) ¶ 3; ECF 22-3 (Akinboyewa Decl.) ¶ 5. These periods "lasting weeks or months" easily fall "within the length of time that courts . . . have found to qualify as an 'inherently transitory' period." *Mons v. McAleenan*, 2019 WL 4225322, at *7 (D.D.C. Sept. 5, 2019); *see, e.g., J.D.*, 925 F.3d at 1311 (explaining that just as "one-year immigration detention . . . would end too soon, so too would a full term of pregnancy"); *Mons*, 2019 WL 4225322, at *7 (applying exception to claims that "most likely" remained live for a maximum period of six

months); *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 183 (D.D.C. 2015) (period of detention lasting "weeks or months" was "too short for a court to be expected to rule on a certification motion"). Furthermore, class members' claims, as discussed below, rest in part on DOC's discriminatory use of protective custody during intake. These are live only for the period of intake, which, while long for the individuals who must live through it, is usually shorter than their custody as a whole.

Independent of the length of incarceration, the "practicalities and prudential considerations" of this class "demand application" of the exception. *Mons*, 2019 WL 4225322, at *7. Where, as here, class members are detained for "uncertain and unpredictable" periods of time, *id.* (citation and internal quotation marks omitted), it is "largely impossible" for a court to determine in advance whose claims will be live past the outer boundary of an inherently transitory period. *Id.* The putative class here includes individuals held pretrial or pre-sentencing, individuals transported from other facilities, individuals awaiting parole hearings, and individuals held post-conviction. ECF 22 (Opp'n to Prelim. Inj'n), at 12-13. DOC argues that the lack of "a general maximum or minimum (or 'average') time period" cuts against this exception, *id.* at 13, but this unpredictability is actually what requires its application. *See Afghan & Iraqi Allies Under Serious Threat v. Pompeo*, 334 F.R.D. 449, 463 (D.D.C. 2020); *Thorpe v. District of Columbia*, 916 F. Supp. 2d 65, 67 (D.D.C. 2013). DOC's protest that it lacks control over the length of incarceration is irrelevant to this exception. *See J.D.*, 925 F.3d at 1311 (applying exception without regard to defendants' control over length of custody); *accord Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975) (same); *see also County of Riverside v. McLaughlin*, 500 U.S. 44, 51-52 (1991) (applying exception where length of pretrial custody was not entirely under defendants' control).

Second, at least some class members will retain a live claim at every stage of litigation because the class claims are not moot or fall within an exception to mootness, as explained next.

**B. DOC's new policy does not deprive the Court of jurisdiction because the class claims are not moot and, alternatively, the "voluntary cessation" exception applies.**

**1. The class claims are not moot, as two types of effectual relief can still be granted.**

A lawsuit is moot "only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party." *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 442 (D.C. Cir. 2020) (quoting *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012)). A party's continuing concrete interest, however small, in the outcome of the case defeats mootness. *Id.*

Here, putative class members' equal protection and DCHRA claims remain live because DOC continues to discriminate against transgender individuals by subjecting them—and not cisgender individuals—to protective custody during intake.[2] So long as a new policy "disadvantages [a group] in the same fundamental way," even if it "may disadvantage them to a lesser degree than the old one," the case is not moot. *Ne. Fla. Chapter of Assoc. Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 662-63 (1993) ("*Ne. Fla.*"); *accord Am. Freedom Def. Init. v. WMATA*, 901 F.3d 356, 362 (D.C. Cir. 2018). It does not "matter that the new [policy] differs in certain respects from the old one." *Ne. Fla.*, 508 U.S. at 662. Plaintiff has always alleged—and supported with unrefuted evidence—that being "housed in a protective custody unit is not a viable alternative" to being housed presumptively or solely based on anatomy because it "is functionally equivalent to solitary confinement." ECF 1 (Complaint) ¶ 39; *see* ECF 4-3 (Chen Decl.) ¶ 7; ECF 4-4 (Golden Decl.) ¶ 6; ECF 4-5 (Kupers Decl.) ¶¶ 6-8; ECF 4-7 (Hinton Decl.) ¶¶ 8-10; ECF 19-2 (Richardson Decl.) ¶¶ 19-25; ECF 19-10 (Robinson Decl.) ¶ 13. Nonetheless, DOC has replaced its discriminatory anatomy presumption with the discriminatory use of protective custody. "[T]he gravamen of [plaintiff's] complaint," *Ne. Fla.*, 508 U.S. at 662, regarding the discriminatory

---

[2] Ms. Hinton brought her equal protection and DCHRA claims, but not her due process claim, on behalf of the class. *See* ECF 1 (Complaint) ¶¶ 46-59. Her release moots the due process claim.

treatment of transgender individuals in DOC housing persists: DOC is still subjecting transgender people to a unique disadvantage not applicable to cisgender people. Thus, the case is not moot. This Court still can and should grant effectual relief by enjoining DOC from discriminatorily subjecting transgender individuals to protective custody based on transgender status.

Additionally, Plaintiff's claim that procedural safeguards are required remains live despite DOC's new policy. *See Ctr. for Food Safety v. Salazar,* 900 F. Supp. 2d 1, 5-6 (D.D.C. 2012) (recognizing that "the availability of any form of relief will save a case from mootness," even if it is only a "partial remedy"). Plaintiff's evidence strongly suggests that without this relief, DOC's elimination of the anatomy criterion will be worth little—a mere "paper policy." *Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000). The new policy instructs DOC to house transgender individuals in the gender housing unit of their preference unless the THC identifies safety/security concerns with that preference. H Policy §§ 2(a); 11(b). But as Plaintiff's unrefuted evidence shows, DOC officials have repeatedly coerced transgender individuals into misrepresenting their preference to align with *DOC's* apparent preference to house them according to sex assigned at birth. ECF 15-1 (Hinton Supp. Decl.) ¶¶ 4-9; ECF 16-1 (Second Supp. Hinton Decl.) ¶¶ 2-6; ECF 19-7 (Moorman Decl.) ¶¶ 13-16; ECF 19-6 (Watkins Decl.) ¶¶ 9-13.

DOC's treatment of Ms. Hinton is particularly alarming: Days after she filed this suit, the District opposed her TRO, claiming that she had expressed a preference for being housed with another transgender woman in a men's unit and that transferring her there mooted her claim. ECF 14 (Opp'n to TRO) 2-5. But DOC had misrepresented her "preference"; Ms. Hinton had asked repeatedly to be housed in a women's unit and signed a form to the contrary only after she was told that she could not be housed with women and after she requested but was denied the opportunity to consult with counsel. ECF 15 (Pl.'s TRO Reply Br.) 4. After DOC's gambit was

revealed to the Court, DOC rushed to grant Ms. Hinton *another* THC hearing, at which DOC officials argued that she would be sexually harassed in a women's unit, even though Ms. Hinton reiterated that she would be safer there than with the men. ECF 19 (Pl.'s Supp. Br.) 2-3. Only after this second hearing was Ms. Hinton finally moved to the facility of her actual preference. DOC says it "disputes" all of this, ECF 22 (Opp'n to Prelim. Inj'n) 4 n.3, but provides no evidence. That DOC is so brazen as to coerce and misrepresent the preference of someone *who is represented by counsel and in the midst of litigating this very issue*—and subsequently coerce at least three others into signing forms, ECF 19 (Pl. Supp. Br.) 3-5—shows that procedural safeguards are critical to ensure that DOC does not attempt to manipulate an individual's "preference" to achieve a result that conforms with DOC's prejudgments, *see* ECF 19-7 (Moorman Decl.) ¶ 5; ECF 15-1 (Hinton Supp. Decl.) ¶¶ 4-6; ECF 19-10 (Robinson Decl.) ¶ 8. Because the H Policy provides no safeguards to protect against coercive conduct, there remains a genuine controversy—and relief the Court could grant—in this respect as well.

### 2. Alternatively, the "voluntary cessation" exception to mootness applies.

Setting aside the continuing discrimination under the H Policy, DOC's voluntary cessation of its original policy of classifying transgender individuals presumptively or solely based on anatomy does not moot the challenge to that policy unless DOC shows that "(1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely or irrevocably eradicated the effects of the alleged violation." *Zukerman*, 961 F.3d at 442 (citations and internal quotation marks omitted). As the party urging mootness, the District "bears the 'heavy burden'" of making these showings. *Id.* at 441. It fails as to both.

First, on recurrence, the District's unilateral policy change does not exist in a vacuum. The District cannot carry its heavy burden of showing it is "absolutely clear" that the alleged violation

could not reasonably recur, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 170 (2000), given its coercive tactics in this litigation, past and present failures to implement its written policy, history of revising its policy, and the convenient timing of this revision.

Start with DOC's behavior in this litigation. As detailed above, DOC has engaged in coercive tactics since the filing of this lawsuit, first by misrepresenting Ms. Hinton's preference to this Court and attempting to moot her claim based on it, then by coercing three other transgender individuals into signing preference forms. Additionally, DOC is not even following its new H Policy: a month after that policy issued, at least three transgender individuals in its custody have not received THC hearings. Whatever "presumption of regularity" usually applies to government actors, DOC's own actions in this litigation render that "presumption . . . weaker than it might otherwise be." *Shapiro v. Dep't of Justice*, 507 F. Supp. 3d 283, 336-37 (D.D.C. 2020) (expressing skepticism of agency that made "previous omissions" to the court and plaintiff in "explaining the evolution of its [challenged FOIA] policies").

Furthermore, DOC has unilateral authority in promulgating housing policies, which it exercised in rescinding the G Policy and issuing the H Policy. Nothing prevents DOC from reverting to its prior illegal ways—either by unilaterally rescinding the new policy or by simply refusing to implement it as soon as DOC is free of this litigation. This reversion is far from speculative; Plaintiff's evidence shows how DOC ignored its previous policy by suspending the THC for more than a year until this litigation commenced. ECF 4-7 (Hinton Decl.) ¶¶ 4-5; ECF 4-9 (Cicurel Decl.) ¶¶ 6-8; ECF 4-13 (Ex. D to Cicurel Decl.).[3] Additionally, even the written policy is subject to revision at any time; it has been revised three times in the past four years. *See, e.g.,*

_____

[3] The District's declarant has suggested that the THC did not convene because there were no housing requests to evaluate, *see* ECF 14-1 (Reid Decl.) ¶ 5, but that is demonstrably false, *see, e.g.,* ECF 19-7 (Moorman Decl.) ¶¶ 2-4; ECF 19-6 (Watkins Decl.) ¶¶ 1, 13.

ECF 4-12 (Ex. C, Cicurel Decl.) (Policy 4020.3F) (issued January 18, 2018); G Policy (issued October 15, 2019); H Policy (issued June 17, 2021). A correctional facility's practice of frequently changing policies supports likelihood of recurrence. *See Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014) (holding that a state prison's policy change did not moot claims in part because "the fact that at least three separate policies have been utilized . . . since 2009 indicates some degree of doubt that the new policy will remain in place for long"); *Longstreth v. Maynard*, 961 F.2d 895, 900 (10th Cir. 1992) (holding that a change in prison hair grooming policy did not "afford such an assurance that the threatened harm may not recur" in part because the policy "ha[d] varied considerably"); *see also Charles v. Daley*, 749 F.2d 452, 458 (7th Cir. 1984) (determining that the state's reenactment of a challenged statutory section "would not be unlikely" because the state had repeatedly amended the statute in question). Ms. Hinton has alleged far more than "authority to reinstitute the policy." *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008). Instead, by pointing to DOC's coercive maneuvers, past failure to abide by its own policy, and frequent revisions of the policy, Plaintiff has supplied "evidence indicating that the challenged [policy] likely will be reenacted," *id.*, or reenacted *de facto* through DOC's non-implementation tactics.

DOC's timing in issuing this new policy—about a month after suit was filed—also weighs against mootness: "Whether the defendants' cessation was timed in anticipation of a lawsuit or motivated by a genuine change of heart is relevant to the voluntary cessation analysis." *DL v. District of Columbia*, 187 F. Supp. 3d 1, 11 (D.D.C. 2016). Coming into compliance with the law "in direct response to . . . litigation" makes it more difficult for the District to demonstrate that recurrence is unlikely. *Id.*; *accord Young v. D.C. Hous. Auth.*, 31 F. Supp. 3d 90, 98 (D.D.C. 2014) (applying voluntary cessation doctrine where defendant had not been seeking to "remedy its . . . policy and practices prior to the commencement of litigation").

For all of these reasons, DOC cannot carry its "heavy burden" to overcome the "voluntary cessation" doctrine, which exists to avoid leaving a wrongdoer "free to return to his old ways." *Friends of the Earth*, 528 U.S. at 189 (cleaned up).

*Second*, in addition to showing no reasonable risk of recurrence, the District must establish that its actions "completely or irrevocably eradicated the effects of the alleged violation." *Zukerman*, 961 F.3d at 442 (cleaned up). It has not come close to doing so. Although the H Policy became effective a month ago on June 17, 2021, transgender women (and putative class members) Latisa Moorman, Courtney Phillips, and Jessica Watkins did not receive the THC hearings promised by the H Policy and remain today (or, in the case of Ms. Moorman, remained until her release from custody entirely on July 9) in men's units, just as they were prior to June 17. *See* Supp. Decl. of Latisa Moorman ¶¶ 2-3; Supp. Decl. of Courtney Phillips ¶¶ 3-7, 9; Supp. Decl. of Jessica Watkins ¶¶ 2-5. Thus, discriminatory classifications made pursuant to the G Policy persist despite the H Policy. Additionally, the H Policy *itself* perpetuates transgender discrimination. Transgender individuals in DOC custody will still be subject to discriminatory treatment based on their identity—now, by being forced into protective custody upon intake. Putative class members taken into custody in the future may also continue to experience the effects of the District's former presumption in favor of housing based on sex assigned at birth because the new policy does not implement procedural safeguards that Plaintiff has demonstrated are necessary to protect against DOC's strongarm tactics. Without these, the new policy's use of "preference" for post-intake housing is meaningless: DOC officials may continue their practice of unduly pressuring or otherwise overrunning transgender individuals' preferences. The persistence of these concrete effects independently dooms DOC's attempt to carry its burden to overcome "voluntary cessation."

**II. Plaintiff's Proposed Class Meets The Requirements Of Rule 23(a), And Certification Is Warranted Under Rule 23(b)(2).**

The District's opposition to class certification relies largely on its erroneous assertion of mootness; to the extent it does not, it misunderstands Rule 23. Having already addressed mootness, Ms. Hinton turns to DOC's other objections.

**A. The proposed class is "adequately defined."**

Assuming *arguendo* that an ascertainability requirement exists, *but see Ramirez v. ICE*, 338 F. Supp. 3d 1, 48 (D.D.C. 2018) (characterizing the existence of such a requirement as "far from clear"); *see Afghan & Iraqi Allies*, 334 F.R.D. at 464 (noting that, although the D.C. Circuit has not addressed the issue, four Circuits have "disavowed" the ascertainability requirement), Plaintiff's class definition satisfies this "not . . . particularly stringent test" because the class is "ascertainable by reference to or based on objective criteria" and "analysis of the objective criteria" is "administratively feasible." *Brewer v. Lynch*, 2015 WL 13604257, at \*5-\*6 (D.D.C. Sept. 30, 2015) (internal citation omitted). That is, the class's "the general outlines . . . are determinable at the outset of the litigation without engaging in burdensome individualized determinations." *O.A. v. Trump*, 404 F. Supp. 3d 109, 160 (D.D.C. 2019) (internal quotation omitted).

The proposed class—"all transgender individuals who currently reside in a [DOC] housing unit that does not accord with their gender identity, or who will be detained in a DOC facility in the future"—is readily ascertainable based on three objective characteristics: transgender identity, status in DOC custody, and (in the case of those currently in custody) housing facility. The District's objection to the inclusion of those currently in custody who may prefer to be housed in facilities inconsistent with their gender identity and the inclusion of future detained transgender individuals has nothing to do with ascertainability, which is solely concerned with whether class

members are identifiable. *See, e.g., O.A.*, 404 F. Supp. 3d at 160 ("Nor is it at all unusual or improper for a Rule 23(b)(2) class to include future members.").

DOC's overbreadth objection is doubly misplaced. First, overbreadth is "not a criteri[on] considered" in determining whether a class is "sufficiently defined." *Brewer*, 2015 WL 13604257, at *6 n.5. Second, the proposed class is not, in any event, overbroad. It encompasses two groups, each of which suffers or will suffer injury from DOC's policy: transgender individuals who are in custody now and therefore have been classified based on anatomy under the G Policy without the opportunity for an individualized assessment; and future transgender individuals, all of whom would be subject to either the current, unlawful H Policy or (potentially, as explained in the voluntary-cessation section above) the prior, unlawful G Policy. The class definition and requested relief are both tailored to the relevant injuries caused by the policy, and thus are not overbroad.

**B.  The proposed class satisfies numerosity because joinder is impracticable.**

DOC does not dispute Plaintiff's core point about impracticability: the "constantly revolving" nature of a correctional institution's population. ECF 19 (Pl.'s Supp. Br.) 10 (collecting authorities). Instead, DOC claims that notwithstanding this hurdle, joinder is feasible because the class is geographically concentrated and Plaintiff has identified several members. Both points are non sequiturs: what makes joinder impractical is not that class members are dispersed but that they may arrive and leave DOC custody too quickly to be identified and joined, and the fact that Ms. Hinton's attorneys were able to identify a few members at a single point in time (around when Ms. Hinton herself was incarcerated and could help identify class members) simply does not show that they will be able to identify all class members into the indefinite future.

The District points to its evidence that "only eight transgender inmates currently reside in DOC facilities," ECF 23 (Opp'n to Class Cert.) 7, but the same evidence supports Plaintiff's point

that a single number does not tell the whole story. To the best of the DOC declarant's knowledge, there were six transgender individuals in DOC custody on June 1, 2021, and eight on June 17. ECF 22-3 (Akinboyewa Decl.) ¶¶ 6-7. Because Star Parker, a transgender woman previously identified by Plaintiff, was released on June 9, 2021, *id.* ¶ 5, it appears that in a two-week time period, at least three new transgender individuals came into DOC custody and at least one left. This type of movement in and out of the class illustrates why joinder is so impractical—by the time Plaintiff becomes aware of a transgender individual's claim, they may already have left the facility. Ms. Hinton was held for a month, Star Parker for about two. *See also* ECF 19-10 (Robinson Decl.) ¶ 2 (held for around two weeks in November 2019).

Additionally, even focusing on numbers alone, the District does not refute Plaintiff's charge that DOC's "internal tracking appears faulty." ECF 19 (Pl.'s Supp. Br.) 9-10 (identifying a number of transgender declarants of whom the District's previous declarant appeared unaware). Nor does the District dispute that concerns about retaliation impede accurate estimates of transgender individuals and chill individualized litigation. ECF 19 (Pl.'s Supp. Br.) 11; ECF 7 (Mot. for Class Cert.) 4-7. Finally, DOC has no answer to this Circuit's principle that "future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them.'" *J.D.*, 925 F.3d at 1322 (internal citation omitted).

### C. The proposed class satisfies the commonality and typicality requirements.

Most of the District's commonality and typicality arguments rest on its faulty mootness premise. ECF 23 (Opp'n to Class Cert.) 9-10. For the same reasons Plaintiff's claims are not moot, common questions of fact or law remain, including several that Plaintiff initially identified. *See* ECF 7 (Mot. for Class Cert.) 8-9 (asking "[d]oes Defendant's policy facially classify people based on gender identity" and "[d]oes transgender status constitute a quasi-protected class such that

classifications based on transgender status receive heightened scrutiny under the Equal Protection Clause?" among others). In addition to these, other common questions include whether the Defendant's discriminatory use of protective custody at intake satisfies the applicable level of scrutiny and whether Defendant's justification for its use of protective custody has evidentiary support. Any of these shared questions establishes commonality, even if there are "factual variations among the class members." *Bynum v. District of Columbia*, 214 F.R.D. 27, 33 (D.D.C. 2003). Relatedly, putative class members' common injuries remain, including "the indignity of unjustified discrimination" in being placed in protective custody and "the risk of misclassification, and the serious possibility of sexual assault and sexual harassment if misclassified," ECF 7 (Mot. for Class Cert.) 8—which can still result under the H Policy because it lacks procedural safeguards.

The District argues that commonality is defeated by the fact that the THC conducts individualized housing assessments, but this misconstrues Plaintiff's position. Plaintiff does not challenge "individual, discretionary . . . decisions" made under a variety of policies, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 358-59 (2011), but rather raises a "common contention"—that DOC's general policy regarding the housing of transgender individuals (and its implementation) is discriminatory—the resolution of which will address each class member's claim "in one stroke." *Id.* at 350. Because all putative class members are subject to that common policy, they suffer common injury. Moreover, under the H Policy, there is no individualized assessment involved in housing all transgender individuals in protective custody during intake based on their trans status alone, so DOC's argument about individualization fails even on its own terms.

The typicality requirement focuses on whether the class representative "suffered a similar injury from the same course of conduct." *Bynum*, 214 F.R.D. at 34. Typicality is "liberally construed by courts" and "[f]actual variations between the claims of class representatives and the

claims of other class members . . . do not negate typicality." *Id.* That Ms. Hinton was housed under an earlier version of the policy accordingly does not defeat typicality. Ms. Hinton, like the other putative class members, faced discriminatory treatment with regard to DOC housing based on transgender status, *see Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 52 (D.D.C. 2010) (explaining that typicality is satisfied where claims arise from the same course of events and "each class member makes similar legal arguments to prove the defendant's liability"), and also experienced the type of coercion from which she seeks safeguards to protect other class members who are similarly vulnerable.

### D. Ms. Hinton is an adequate class representative.

Ms. Hinton remains an adequate representative. She does not have competing interests with unnamed class members, and she is able to vigorously prosecute the class's interests. *See Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997). She has suffered a typical injury, as discussed. The fact that she was eventually housed in a unit corresponding to her gender identity and then released from custody does not negate her adequacy as a class representative. *See J.D.*, 925 F.3d at 1313. Rather, Ms. Hinton has—from the outset—sought to help herself "and all other transgender individuals incarcerated," ECF 4-7 (Hinton Decl.) ¶ 14.

### E. Certification is warranted under Rule 23(b)(2).

The requirement of Rule 23(b)(2) "that a defendant has acted in a consistent manner toward members of the class so that [its] actions may be viewed as part of a pattern of activity," *Bynum*, 214 F.R.D. at 37 (cleaned up), is plainly met. Plaintiff continues to challenge the H Policy and (on her voluntary cessation theory) the G Policy—both of which, on their face, discriminate against class members. Her requested relief—eliminating the discriminatory protective custody requirement, prohibiting the use of anatomy as a sole or default criterion in housing, and providing

procedural safeguards to prevent coercion of class members—applies across the class as well. DOC argues otherwise based on the individualized nature of the ultimate housing decision, but that approach repeats the mistake of DOC's commonality argument—ignoring the gravamen of the challenge, which is to DOC's discriminatory *policies*, not individual housing decisions.

## III. DOC's Remaining Arguments Opposing Preliminary Injunction Rest On Its Incorrect Premise Of Mootness And Therefore Fail.

Other than mootness, the District offers no response on the merits of Ms. Hinton's constitutional and DCHRA claims, nor does the District substantively dispute the remaining factors other than by reference to the new policy. As discussed above, the new policy does not moot Plaintiff's claims. Plaintiff has shown that all four prongs—likelihood of success, irreparable harm, balance of equities, and public interest—favor granting relief.

### A. Plaintiff is likely to succeed against either the G Policy or the H Policy.

Under Plaintiff's primary argument that the case is not moot, the Court should "deal with the world as it is now, not as it was when the case was filed," *Am. Freedom Defense Init.*, 901 F.3d at 363, and so Plaintiff addresses the merits of the new policy (H Policy) below. Under Plaintiff's alternative voluntary cessation theory, the Court should evaluate the originally challenged policy (G Policy). Plaintiff maintains her original arguments on the merits of that policy, *see* ECF 4-1 (Pl.'s Mot. for PI); ECF 19 (Pl.'s Supp. Br.), which DOC has never attempted to refute.

Plaintiff remains likely to succeed on the merits of her equal protection and DCHRA claims against the H Policy, which (like its predecessor) discriminates against transgender individuals. The H Policy requires all transgender individuals to be placed in protective custody—which the undisputed evidence shows is akin to solitary confinement—during intake, H Policy § 10(a); *id.* § 9(f), whereas cisgender individuals are not subject to the same punitive treatment. In contending

that it does not treat transgender and cisgender individuals differently, ECF 22 (Opp'n to Prelim. Inj'n) 15, DOC simply ignores the part of its policy imposing protective custody at intake.

The new policy must "survive heightened scrutiny" because it "rests on sex-based classifications *and* because transgender people constitute at least a quasi-suspect class." ECF 4-1 (Pl.'s Mot. for Prelim. Inj'n) 7 (quoting *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, No. 20-1163 (June 28, 2021) (emphasis in original), and collecting cases applying intermediate scrutiny). The District bears the "demanding" burden to show (1) an "exceedingly persuasive" justification that is "genuine, not hypothesized or invented *post hoc*" and does "not rely on overbroad generalizations," and (2) that "the discriminatory means employed are substantially related to the achievement of [the government's] objectives." *United States v. Virginia*, 518 U.S. 515, 524, 533 (1996) (internal citation omitted). DOC has not contested that heightened scrutiny applies.

DOC's policy provides no specific justification for the forced use of protective custody. Its general "safety, security and order" rationale, H Policy § 2(a), cannot support such a discriminatory measure because "generalized concerns for prison security are insufficient" to meet its burden under intermediate scrutiny. *Doe v. Mass. Dep't of Corr.*, 2018 WL 2994403, at *10 (D. Mass. June 14, 2018) (citing *Virginia*, 518 U.S. at 531). DOC's safety rationale here could not possibly be more "generalized"; the H Policy subjects all transgender individuals to protective custody automatically, whether necessary to promote anyone's safety or not.

Under the H Policy, transgender individuals may easily spend a week or more in protective custody during intake, far longer than relevant PREA regulations allow for. Under PREA, "protective custody" (or "involuntary segregated housing") should be used sparingly and only after an assessment of alternatives. 28 C.F.R. § 115.43(a). A facility "may hold [an individual] in

involuntary segregated housing for less than 24 hours while completing [this] assessment," *id.*, but the H Policy far exceeds this limit. As discussed earlier, the Policy exempts weekends, holidays, and emergencies from its time requirements and then forces the individual to wait *further* for a THC determination and subsequent transfer; all told, H Policy allows DOC to hold transgender individuals in involuntary protective custody for a week or more. Because DOC's policy discriminates based on gender identity and is not substantially related to jail safety, Plaintiff and putative class members are likely to succeed on the merits of their equal protection claim.

Ironically, the District champions its individualized THC assessment process as satisfying equal protection, ECF 22 (Opp'n to Prelim. Inj'n) 16-17, while ignoring the categorical rule it imposes on transgender residents during the intake process, i.e., imposing solitary confinement for a week or more, *just because they are transgender*. Similarly situated cisgender residents are not subject to the same harms. The discrimination is obvious. Less obvious, but no less concerning, is the likelihood that DOC's individualized process with respect to post-intake housing will differ from its prior policy only on paper. Given DOC's documented history of coercion, its new paper policy is insufficient without procedural safeguards.

For similar reasons, the District's policy continues to violate the DCHRA and its implementing regulations, which prohibit DOC from "refusing to provide any facility, service, program, or benefit of the District of Columbia government" based on gender identity. 4 D.C.M.R. § 801.1(e). Forcing transgender individuals into protective custody necessarily denies them the same facilities and services that cisgender individuals receive because access to recreation, showers, and other services is restricted. *See* ECF 19-6 (Watkins Decl.) ¶ 6; ECF 4-3 (Chen Decl.) ¶¶ 5-7; ECF 4-4 (Golden Decl.) ¶ 6. Furthermore, without the proper procedural protections,

transgender individuals may still be "den[ied] access to . . . gender specific facilities that are consistent with [their] gender identity," in violation of the DCHRA. 4 D.C.M.R. § 801.1(e).

The equal protection and DCHRA claims are likely to succeed on the merits.

**B. The class faces irreparable harm absent relief.**

The District again does not present any substantive opposition on irreparable harm; it merely notes Ms. Hinton's release from custody and the changed policy. But the new policy continues to subject putative class members to irreparable injury. Plaintiff's previous briefing as well as the array of declarations already submitted leave no room for doubt: being placed in protective custody is psychologically damaging. *See* ECF 4-1 (Pl.'s Mot. for Prelim. Inj'n) 17-18; ECF 4-5 (Kupers Decl.) ¶¶ 6-8 (describing the severe psychological damage individuals in solitary confinement suffer and explaining that "housing utilized to effect safety" for transgender individuals "must not constitute solitary confinement"). Courts regularly recognize that the injuries resulting from this practice constitute irreparable harm. *See, e.g.*, *Doe by and through Frazier v. Hommrich*, 2017 WL 1091864, at *2 (M.D. Tenn. Mar. 22, 2017) ("The harm suffered in solitary confinement is not harm easily undone."); *Orantes-Hernandez v. Smith*, 541 F. Supp. 351, 384 (C.D. Cal. 1982) (finding it "readily apparent" that immigration detainees confined only for a matter of days nonetheless would "suffer irreparable injury from arbitrary solitary confinement").

Furthermore, absent the necessary procedural safeguards, putative class members still risk being pressured into specifying false housing "preferences" and subsequent misclassification, placing their safety at imminent danger. ECF 4-1 (Pl.'s Mot. for PI) 19; ECF 19 (Pl.'s Supp. Br.) 8, 11-13. Plaintiff's argument that the risk of physical harm as a result of misclassification establishes irreparable harm remains uncontested. Finally, putative class members' constitutional rights to equal protection continue to be violated by DOC's discriminatory policy; the "loss of

constitutional freedoms, for even minimal periods of time" is irreparable harm. *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (internal citation omitted).

### C. The balance of equities and the public interest continue to favor relief, and the requested relief comports with the PLRA.

It is "always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (citation omitted). DOC's new policy continues to violate putative class members' constitutional rights. Plaintiff's requested relief is necessary to ensure that putative class members' preferences are not coerced and to address the continuing constitutional violation of mandatory protective custody.

Other than disputing that its new policy is unlawful or harmful (points addressed above), DOC's only argument on these factors is that relief is incompatible with the PLRA. In light of DOC's new policy, Ms. Hinton submits a revised proposed order. That order is compatible with the PLRA. The revised order eliminates aspects of the prior order that would be duplicative of DOC's new policy regarding gender classification at intake. The revised order adds a prohibition on categorical use of protective custody against transgender individuals; this measure is precisely tailored to the new violation created by the H Policy (discriminatory use of protective custody). It does not extend further than necessary or intrude on DOC's operations because it does not bar DOC from using protective custody as needed in individual circumstances. Instead, it merely enjoins DOC from *categorically* relegating transgender individuals to protective custody based on their identity. In light of the voluntary cessation argument and the evidence that discriminatory housing classifications pursuant to the G Policy persist because DOC is not implementing the H Policy, Ms. Hinton's revised order still includes a prohibition on using anatomy as the sole or default criterion, and the requirement of prompt THC hearings that class members are *still* not getting; these elements can hardly be intrusive, as DOC purports to have voluntarily adopted them.

Ms. Hinton's revised order continues to include procedural safeguards; DOC's objections to these on PLRA grounds are meritless. Ms. Hinton has already detailed how requiring access to counsel for signing Gender Housing Request Forms and THC hearings is directly responsive to coercion, which DOC engaged in (at least) *four* separate times during the brief lifespan of this litigation." ECF 19 (Pl.'s Supp. Br.) 13. DOC argues that safeguards are unwarranted because they would not rectify any harm, and DOC attempts to discount the importance of its housing form as an expression of preference, but DOC's memory is short. Plaintiff requested this relief only after DOC's behavior in this litigation made clear that it was imperative to protect putative class members' rights. DOC officials coerced Ms. Hinton into signing a Gender Housing Request Form that stated a "preference" she expressed only after being denied her actual preference (to be housed with women) and being denied access to counsel. The District *then used Ms. Hinton's stated "preference" in its own filing to suggest that her case was moot*. ECF 14 (Opp'n to TRO) 2-5. The protective measures Plaintiff requested—notice and an opportunity to consult with counsel—are minor intrusions on DOC's administrative functions but critical to protect the class in the face of DOC's pattern of undermining putative class members' ability to meaningfully express their preferences. For this reason, they satisfy the requirements of the PLRA. *See Armstrong v. Newsom*, 484 F. Supp. 3d 808, 851-52 (N.D. Cal. 2020) (ordering remedial measures including mechanisms to "end and prevent any retaliation against class members" and to share information with Plaintiffs' counsel, and finding these measures consistent with the PLRA).

## CONCLUSION

For the reasons above, and in Plaintiff's motions and supplemental brief, ECF 4-1, 7, 19, the Court should certify the class and grant a preliminary injunction. A revised proposed preliminary injunction is attached. Plaintiffs request a hearing at the Court's earliest convenience.

July 16, 2021

Respectfully submitted,

/s/ Scott Michelman
Scott Michelman (D.C. Bar No. 1006945)
Megan Yan* (D.C. Bar No. 1735334)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
American Civil Liberties Union Foundation
    of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
202-601-4267
smichelman@acludc.org

/s/ Rachel Cicurel
Rachel Cicurel* (D.C. Bar No. 1024378)
Steven Marcus (D.C. Bar No. 1630882)
Public Defender Service for the District of Columbia
633 Indiana Avenue N.W.
Washington, D.C. 20004
Tel. 202-824-2774
Fax 202-824-2776
rcicurel@pdsdc.org

*Counsel for Plaintiff***

---

[*] In accordance with D.D.C. Local Civil Rule 83.2(g), the attorneys whose names are marked with an asterisk above certify that: (i) they are members in good standing of the District of Columbia Bar; (ii) they are representing a petitioner who is indigent within the meaning of Local Rule 83.2(g), at no cost to petitioner; (iii) they have never been subject to disciplinary complaint or sanction by any court or other disciplinary authority; and (iv) they possess a copy of the Local Rules of this District and are familiar with the rules generally and as they pertain to this proceeding.

[**] Counsel wish to acknowledge the assistance of paralegal Elaine Stamp and intake specialist Jada Collins in the preparation of this filing.