## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SUNDAY HINTON, on behalf of herself and others similarly situated,<br><br>                      Plaintiff,<br><br>    v.<br><br>DISTRICT OF COLUMBIA,<br><br>                      Defendant. | No. 1:21-cv-1295-JDB |

## AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
(equal protection, due process, and D.C. Human Rights Act claims for gender-identity and sex discrimination)

Plaintiff Sunday Hinton, on behalf of herself and a class of similarly situated transgender individuals residing in a District of Columbia Department of Corrections (DOC) housing unit that does not accord with their gender identity, or who will be detained in a DOC facility in the future, alleges as follows:

### PRELIMINARY STATEMENT

1. Under DOC's Policy 4020.3G, which was in effect when this case was filed on May 11, 2021, its decision whether to house a detained transgender individual in a men's or women's unit was presumptively based on their anatomy, unless the DOC's Transgender Housing Committee (THC), a committee tasked with evaluating the vulnerability and safety needs of transgender individuals, recommended otherwise and the warden approved.

2. From January 2020 until shortly after the filing of this complaint in May 2021, the THC had not met. Functionally, then, for those 16 months, transgender individuals in DOC custody were

assigned housing based *solely* on their anatomy. DOC's Office of the General Counsel confirmed that the policy was applied in this manner.

3. Plaintiff Sunday Hinton, a transgender woman, came into DOC custody on April 26, 2021, and was automatically assigned to a men's housing facility under DOC's policy. Despite informing DOC officials of her gender identity and requesting to be transferred to the women's unit, she remained incarcerated in a men's unit more than two weeks later.

4. On May 11, 2021, she filed this case, asserting violations of constitutional and D.C. law. She sought immediate, emergency relief to prevent DOC from continuing to house her in a men's unit, where she was at risk of sexual violence as a transgender woman, and she sought classwide relief against DOC's transgender housing policy.

5. The following day, DOC tried to coerce Ms. Hinton into waiving her rights by offering her a marginally safer housing placement, still within a men's unit, on the condition that she sign a form disclaiming her desire to be housed in a woman's unit—all without her counsel present and in spite of her request to speak with her counsel. After DOC's gambit was revealed to the Court, DOC hastily convened a new THC hearing for Ms. Hinton and, just minutes before the first scheduled hearing in this case, agreed to transfer Ms. Hinton to a woman's housing unit.

6. Ms. Hinton was subsequently released from custody as a result of the proceedings in her criminal case, but she continued to pursue class certification and a preliminary injunction on behalf of the class to protect others from DOC's demeaning and dangerous policy.

7. On June 17, 2021, a day before its deadline to oppose Ms. Hinton's motions, DOC issued a new, superseding transgender housing policy, numbered 4020.3H. The new policy removes the presumptive anatomy-based assignment, but it also imposes a new discriminatory measure: upon initial intake to a DOC facility, all transgender individuals are automatically placed in

protective custody for a period that can last a week or more, simply on the basis of their transgender status, and despite the punitive nature of protective custody at DOC facilities.

8. The new policy requires that transgender individuals in custody be given THC hearings, yet a month after the new policy went into effect, THC hearings had not been provided for all transgender individuals in custody. Specifically, none of the three transgender women who were identified in this litigation as putative class members and who were still in DOC custody on June 17 was given a THC hearing, assigned new housing, or even informed of the policy change by DOC.

9. Because DOC's unconstitutional transgender housing policies expose every transgender individual in its custody to discrimination, degradation, and risk of sexual violence, Ms. Hinton continues to seek classwide relief.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this action presents federal questions and seeks to redress the deprivation of rights under the Fifth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

11. Plaintiff's claims under the statutory law of the District of Columbia arise from the same events as the constitutional claims and are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because all of the events or omissions giving rise to this action occurred, and continue to occur, in this District.

## PARTIES

13. Plaintiff Sunday Hinton is a resident of the District of Columbia. She is a transgender woman who at the time this case was filed was held, pretrial, in the custody of the DOC at the Central Detention Facility, a men's facility.

14. Defendant District of Columbia is a municipal corporation, the local government of Washington, D.C. It operates and governs the DOC pursuant to the laws of the District of Columbia. The District acted through its agents, employees, and servants in this case.

## FACTUAL ALLEGATIONS

### DOC's Transgender Housing Policy When This Case Was Filed

15. In effect from October 15, 2019, to June 17, 2021, including when this case was filed on May 11, 2021, DOC Policy 4020.3G, titled "Gender Classification and Housing" (the "G Policy") established procedures for initial intake and housing assignments for transgender and intersex individuals in DOC custody. The policy tasked the THC with recommending appropriate housing assignments for transgender and intersex individuals in DOC custody, subject to the final decision of the warden and the director of DOC.

16. DOC Policy 4020.3G was an official policy of the District of Columbia as carried out through the Department of Corrections.

17. The policy established a default presumption that transgender individuals in DOC custody would be housed according to their anatomy, not their gender identity. Specifically, the policy stated: "DOC shall classify an inmate who has male genitals as a male and one who has female genitals as a female, unless otherwise recommended by the [THC] and approved in accordance with this policy."

18. The policy provided that, upon initial intake, staff should make a "determination of gender" of a transgender individual whose "gender-related expression, identity, appearance, or behavior differs from their sex at birth," by either (1) "inmate verification" (i.e., reviewing "commitment documents for gender assignment or any notification that identifies the inmate as transgender or 'vulnerable'"), or (2) determination of their "genital status" through a medical interview, by reviewing medical records, or, if necessary, a medical exam by a medical practitioner. Any individual who refused to undergo a "complete physical examination" was placed in protective custody. The intake staff were then required to document an individual's transgender status, their gender identity, and their "apparent biological gender."

19. After the initial intake process was completed, the policy required detained transgender individuals to be "housed in a single cell in the intake housing unit consistent with the gender identified at intake for no more than seventy-two (72) hours . . . until classification and housing needs can be assessed by the [THC]." Because of the default presumption, every transgender individual in DOC custody was housed—in an intake unit or otherwise—according to their anatomy until the THC met. The policy did not make clear whether the THC was required to meet or make a recommendation on housing within the 72-hour timeframe.

20. The THC was comprised of the DOC Chief of Treatment and Community Services, DOC Mental Health Specialist, a medical practitioner, a mental health clinician, a correctional supervisor, a case manager, PREA Coordinator, an individual from the Mayor's Office on LGBTQ Affairs, and a DOC-approved volunteer who is transgender and experienced and knowledgeable about transgender issues or an acknowledged expert in trans affairs.

21. Under the G Policy, the THC was supposed to hold a hearing to assess a transgender individual's vulnerability and determine the appropriate housing assignment, unless the

individual waived their right to a hearing and requested to be housed according to their sex assigned at birth.

22.  The regulations implementing the federal Prison Rape Elimination Act (PREA) establish procedures for determining housing assignments for transgender individuals to protect them against sexual victimization. 28 C.F.R. § 115.42. Under PREA, which DOC cited as an authority in its policy, DOC must "make individualized determinations" about safety and must "consider on a case-by-case basis whether a [housing] placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." Moreover, DOC must give "serious consideration" to a transgender individual's "own views" on their safety.

23. The G Policy provided that transgender individuals "will be classified and assigned housing based on their safety/security needs, housing availability, gender identity, and sex at birth." As part of assessing a transgender individual's vulnerability, the policy provided that the THC reviews all "records" including assessments and an interview with the individual. The THC was also required to "ask the inmate to offer their opinion regarding his or her vulnerability in the general jail population of the male or female units," and the policy provided that "[t]his information shall be taken into consideration in determining the proper housing assignment."

24. The THC decided on a housing assignment based on consensus or majority vote. A written decision was then forwarded to the warden for approval. The THC's housing assessment was also required to "address whether the inmate will be housed in the general population or in a protective custody unit of the gender consistent with their gender identity or sex at birth." If it was determined that a detained individual would be housed in the general population, they would be housed in a single cell or with another transgender or intersex individual, "no

exceptions." If it was determined that a transgender individual would be placed in protective custody, the policy noted that they might be placed in communal protective custody pursuant to the THC's determination. If the warden's opinion differed from the recommendation of THC, the warden was to explain the housing assignment in writing to the director, who then made the final determination.

25. The THC's recommendations did not in practice lead to the housing of transgender individuals in accordance with their gender identity when it differed from their anatomy.

26. Indeed, according to a member of the THC, even when the THC did meet, the THC did not override the anatomy presumption, leading to people being housed according to their genitals rather than their gender identity.

27. The THC did not meet between January 2020 and May 2021. Accordingly, transgender individuals in DOC custody did not receive individualized housing determinations.

28. As a result, according to an attorney from DOC's Office of the General Counsel, DOC determined housing assignments for transgender individuals—at least as of the filing of this case—based *solely* on their anatomy. If a detained transgender woman was deemed "anatomically male," for example, she would be housed in a men's unit regardless of her gender identity as a woman or her risk of sexual assault and harassment in a men's unit.

**Sunday Hinton's Housing**

29. On April 26, 2021, Plaintiff Sunday Hinton was detained pretrial during her first appearance in D.C. Superior Court and confined to DOC custody on allegations of unarmed burglary with the intent to steal twenty dollars.

30. Although Ms. Hinton is a transgender woman and the Superior Court Lockup List listed her as "female," Plaintiff was housed in a men's unit by DOC.

31. Michelle Wilson of the DOC's Office of the General Counsel informed Ms. Hinton's public defender, Rachel Cicurel, who is also one of Ms. Hinton's attorneys in this action, that Ms. Hinton would be housed according to her "anatomy." Ms. Wilson also asked Ms. Cicurel if Ms. Hinton had "male parts" and insisted that if Ms. Hinton is "anatomically male," she could only be housed in the men's general population or protective custody within a men's unit.

32. Ms. Cicurel called Traci Outlaw, a member of the THC, to see if Ms. Hinton could be transferred to a women's unit.

33. Ms. Outlaw informed Ms. Cicurel that the THC had not met since January 2020.

34. Ms. Outlaw also stated that when the THC does meet, the criteria it considers in determining if an individual should be housed according to "their sex assigned at birth or their gender expression" include (1) whether the individual has had "full [gender] reassignment surgery," and (2) whether the individual has ever been in a "heterosexual relationship."

35. Ms. Outlaw also confirmed that a person's anatomy is a primary focus of the THC's analysis when deciding where to house them. She stated that, for example, a transgender man who came to the jail after taking hormones, with a full beard, was not housed in a men's unit, despite his wishes to be housed with the men, because he still had a "functioning vagina." If he had a "menstrual cycle" while at the jail, Ms. Outlaw stated, "he could not change his pad" while sharing a cell with a man. She also stated that if a transgender woman had not undergone full gender reassignment surgery but had previously been in a heterosexual relationship, it would be particularly concerning if the transgender woman ended up in a women's unit with a "working penis."

36. When Ms. Cicurel inquired if Ms. Hinton could be housed in a women's unit, Ms. Outlaw explained that "even if everyone on the THC agrees that a person is best off" housed in a unit

consistent with that person's "gender expression," the housing decision is ultimately up to the warden. And even if the warden agrees that the transgender woman should be housed in a women's unit, Ms. Outlaw continued, the transgender woman must be "secluded" from the other women.

37. Ms. Hinton is a transgender woman and identifies as a woman. She made clear that she wished to be housed in a general population women's unit, in accordance with her gender identity.

38. Ms. Hinton would have been safer in a women's unit than in the men's unit because transgender women in men's units are at risk of sexual violence, including assault or rape.

39. Ms. Hinton asked to be moved to a general population women's unit in accordance with her identity as a woman.

40. Being housed in a protective custody unit was not a viable alternative for Ms. Hinton.

41. Conditions in protective custody are uniformly worse than in the general population, even during the lockdown in place at DOC facilities during the spring of 2021. Individuals in protective custody are segregated from others and stripped of access to many services, like classes, group therapy, and drug education. Protective custody is functionally equivalent to solitary confinement, a practice that results almost universally in symptoms such as intense anxiety or panic attacks, disordered thinking, problems sleeping, problems with concentration and memory, despair, and repetitive acts such as pacing, cleaning, and counting. Placing a transgender woman in solitary confinement puts her at grave risk of suicide.

42. Confinement in protective custody would have negatively impacted Ms. Hinton's mental health, subjecting her to extreme isolation and making it even more difficult to deal with her anxiety. A protective custody "solution" would mean that transgender individuals like Ms.

Hinton are forced to choose between being housed in a unit inconsistent with their gender identities or solitary confinement.

### The Original Complaint and DOC's Coercive Tactics

43. This case was filed on May 11, 2021, and Ms. Hinton moved for a temporary restraining order the same day.

44. On May 12, Ms. Hinton met with several DOC officials, including Ms. Outlaw. Ms. Hinton reiterated her desire to be housed in a women's unit. Ms. Outlaw discouraged the idea, warning Ms. Hinton that she could be sexually assaulted there. Although Ms. Hinton pointed out that she had already been harassed by the men, the DOC officials still refused to transfer her to a women's unit.

45. Understanding that there was no option for her to be transferred to a women's unit, Ms. Hinton asked the officials if they would allow her to be housed in a men's unit with a transgender friend of hers.

46. The officials agreed, reiterating that they would not put her on the women's unit, before stating, "we're going to make that happen for you, but you need to sign a waiver" indicating that she wanted to be housed in a men's unit.

47. Ms. Hinton requested the presence of counsel because she was confused by the demand that she sign a form. DOC officials informed her that speaking with counsel was not an option.

48. Ms. Hinton signed the waiver because she thought it would be a little safer to be housed with her transgender friend than otherwise on the general population men's unit.

49. DOC then filed an opposition to Ms. Hinton's TRO application on the ground that her waiver form demonstrated her preference to be housed in a men's unit and arguing that her claims were moot.

50. On May 13, Ms. Hinton, through her lawyers, filed her reply brief, along with a sworn declaration explaining the circumstances behind the waiver form and seeking the exclusion of the waiver form as evidence on account of DOC's improper tactics.

51. A hearing in this case was set for 11:45 a.m. on May 14.

52. Hours before the hearing, DOC held another THC hearing for Ms. Hinton with her counsel permitted to "observe" by video feed but not permitted to speak to Ms. Hinton or comment during the hearing. Less than twenty minutes before the court hearing in this case, DOC informed Ms. Hinton's counsel that it would transfer her to a women's unit.

53. During the pendency of this lawsuit, DOC has also housed at least four other transgender individuals at odds with their gender identity despite their wishes, and of these four, DOC pressured at least three (all transgender women) into signing statements stating they wished to be housed with men:

    a. Ms. Courtney Phillips is a transgender woman who has been held in DOC custody in a men's unit since August 2020. Before the filing of this lawsuit, Ms. Phillips was never provided with a housing form or given a choice about whether she would be housed with the men or the women. Ms. Outlaw told Ms. Phillips that the THC was not meeting due to the pandemic and so "they were not assigning any transgender girls to the female housing unit." In mid-May 2021, after Ms. Hinton made the Court aware of DOC's coercive tactics regarding transgender individuals' housing options, a DOC official visited Ms. Phillips and told her to sign a form stating that she wanted to reside with the men—even though being housed with the women had never been an option.

    b. Ms. Latisa Moorman is a transgender woman who was held in DOC custody in a men's unit at the D.C. Jail from April 2021 until her release in July 2021. While she was still

on the intake unit, Ms. Moorman told Ms. Outlaw that she would like to be transferred to a women's unit. Ms. Outlaw tried to dissuade Ms. Moorman, telling her that "the women could try to rape [her]," even though Ms. Moorman told Ms. Outlaw that she "ha[s] been castrated, ha[s] double-D implants, ha[s] had facial feminization done, and [has] even had [her] Adam's apple scraped away." Eventually, Ms. Moorman was transferred from the intake block to a men's unit, without a THC hearing. On or about May 19, 2021, Ms. Moorman met with a DOC official and told her she wanted to be housed in a women's unit. The official tried to dissuade Ms. Moorman by telling her that "the women might try to rape you." The official told Ms. Moorman that she had to sign "papers" either affirming that she was fine in the men's unit or requesting a THC hearing, but the official stated that the THC would send her to protective custody because it would determine that was the safest option. The official did not give Ms. Moorman a chance to read the papers fully. Even though she has been raped by men while held at another institution and is afraid of being raped by men at the D.C. Jail, Ms. Moorman signed the portion indicating that she was fine in the men's unit because she did not want to go to protective custody because she would be shackled around her ankles and waist to her wrists, which would make her feel chained up like an animal.

c.  Ms. Jess Watkins is a transgender woman who has been detained in a men's unit at the D.C. Jail since February 2021. Upon intake, Ms. Watkins asked to be housed with the women, but DOC officials informed her that it would be "impossible" because the THC was not meeting. She has been and remains housed in a men's protective custody unit. In mid-May 2021, a member of the THC met with Ms. Watkins and told Ms. Watkins she needed her to sign a form saying she was willing to remain in a men's protective

custody unit. The official told Ms. Watkins that it was "very unlikely" for her to be moved and kept telling her to sign, which eventually led her to sign the form. Ms. Watkins then filed a complaint that she had been pressured into signing the form.

d. Ms. Star Parker is a transgender woman who was housed in a men's unit at the D.C. Jail from April 2021 until June 2021. She was never provided with a THC hearing, nor was she given the option of residing in a women's unit.

54. Several other transgender individuals who were recently in DOC custody were housed in a unit that does not correspond with their gender identity, including:

a. Ms. Meisha Hines is a transgender woman who was held in DOC custody from August 2019 to January 2021. Upon intake, she requested to be housed with women, but was instead placed in a general population men's unit. While Ms. Hines was in the general population men's unit, she was sexually assaulted and physically attacked by other detained individuals and, as a result, was placed in a men's protective custody unit, where she felt punished because of her identity, for more than a year.

b. Ms. Andrea Richardson is a transgender woman who was held at the D.C. Jail in a men's unit three times—once in 2014 and twice in 2020. Even though Ms. Richardson received a THC hearing in 2014 and expressed concerns for her safety, the THC assigned her to a men's unit, where she was sexually assaulted. In early 2020, Ms. Richardson was arrested and brought to the Jail. She signed a paper stating that she wanted to be housed with the women, but was nevertheless assigned to be housed with the men. In late 2020, Ms. Richardson was again held at the D.C. Jail in a men's unit for about eight months and was never given a THC hearing, despite filing many grievances. She was sexually harassed by other inmates and feared for her life. Ms.

Richardson did not want to be put in protective custody because individuals there are treated like they are being punished and still at risk of assault.

c.   Ms. Seviin Robinson is a transgender woman who was held in DOC custody for two weeks in November 2019. She stayed in an intake housing unit for nearly the entire time. At intake, Ms. Robinson told officials that she wanted to be housed with the other women. She did not receive a THC hearing until the day before she was released. At this hearing, she again informed officials that she wanted to be housed in a women's unit, in accordance with her gender identity. Officials refused, because she had "not had bottom surgery" and "women would rape [her]."

d.   Ms. Ronniesha Tucker is a transgender woman who was held in DOC custody from August 2019 to September 2020 and again from October 2020 to December 2020. Ms. Tucker was housed with men who harassed her.

55. In light of Ms. Hinton's devotion to the interests of the class and her desire to prevent further discrimination and harm to other transgender individuals in DOC custody, Ms. Hinton continued to pursue class certification and preliminary injunctive relief after her release from custody.

**DOC's New Policy**

56. On June 17, 2021, one day before DOC was due to respond to Ms. Hinton's class certification and preliminary injunction motions, DOC issued a new transgender housing policy, replacing Policy 4020.3G with Policy 4020.3H (the "H Policy").

57. The H Policy removes the presumptive use of anatomy in making housing assignments, but it also imposes a new discriminatory measure: placing *all* transgender individuals who are admitted to the jail in protective custody during an intake period that can last a week or more.

58. Specifically, the policy requires (with no exceptions) that transgender individuals "shall be housed in protective custody (voluntary or involuntary protective custody) . . . in the intake housing unit," until the Transgender Housing Committee decides on their classification and the individuals are housed accordingly.

59. Cisgender individuals in the intake process are not housed in protective custody unless there are individual circumstances making that necessary.

60. Residents in protective custody on the intake block are shackled whenever they leave the intake unit, including for legal visits and medical care. In this regard, individuals in protective custody at intake are treated more restrictively and punitively than other individuals on the intake unit, even those who have been charged with violent offenses.

61. Under the H Policy, protective custody for trans individuals may last a week or longer: First, they wait for a Prison Rape Elimination Act (PREA) assessment "within twenty-four (24) hours, excluding weekends, holidays, and emergencies"—meaning individuals who arrive early in a weekend will wait 72 hours (96 if it's a holiday weekend). Next, transgender individuals wait for the THC to "conduct a formal classification and housing needs assessment" "within seventy-two (72) hours" of the PREA assessment, again "excluding weekends, holidays, and emergencies." This time limit is just for the THC's "assessment"; the policy imposes no deadline for the THC to reach a decision and for the individual to be moved from intake. So transgender individuals' time in protective custody can last 4 days, *plus* weekend days (which will necessarily extend either the PREA or THC time by 48 hours unless the individual arrives on a Monday), *plus* any holidays or "emergencies," *plus* an indefinite period for the THC to make a decision and for the individual to be transferred.

62. Under the new policy, DOC houses transgender individuals post-intake based on "their preference, unless otherwise recommended by the Transgender Housing Committee." The new policy does not include safeguards against coercion by DOC officials or against indulging unlikely factual assumptions (like the possibility that transgender women are more likely to be sexually assaulted by women than by men) in order to justify housing transgender individuals based on their anatomy rather than their gender identity.

63. The H Policy requires THC hearings for any transgender individual who "makes known to DOC staff their Transgender . . . status." However, as of July 16, 2021—one month after the H Policy was promulgated—THC hearings had not been provided for all transgender individuals in custody. None of Plaintiff's three prior declarants who were in DOC custody on June 17—Latisa Moorman, Courtney Phillips, and Jessica Watkins (all putative class members)—was assigned new housing, given a THC hearing, or even informed of the policy change by DOC.

64. Because of DOC's non-implementation of the H Policy's requirement of THC hearings for transgender individuals in custody, the discriminatory housing placements made under the G Policy have persisted.

65. DOC retains authority to change its transgender housing policy at any time, and it has done so three times in the past four years.

## CLASS ALLEGATIONS

66. Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiff brings two claims in this action against both of the policies described—the new H Policy and the still-lingering G Policy—on behalf of a class consisting of all transgender individuals who currently reside in a DOC housing unit that does not accord with their gender identity, or who will be detained in a DOC

facility in the future. Plaintiff reserves the right to amend the class definition or establish sub-

classes as appropriate if discovery or further investigation reveals the class should be expanded

or otherwise modified.

67. Numerosity: The class is so numerous that joinder is impracticable. On information and belief,

approximately 40 to 60 transgender people are at any given time housed in DOC custody and

subject to DOC's discriminatory housing policies. Class members include individuals held

pretrial and individuals held for transfer to other facilities and thus may be held in DOC custody

for limited periods of time, making timely identification and litigation of their individual

claims impracticable. Joinder is impracticable also because the class includes unnamed, future

class members who by definition cannot be counted and joined. Further, proposed class

members are highly unlikely to file individual suits on their own, as many of them are indigent,

have limited access to their retained or court-appointed counsel because of restrictions put in

place by DOC in response to the COVID-19 pandemic, are currently incarcerated, fear

retaliation from filing suits against Defendant, and lack access and financial resources to obtain

qualified counsel to bring such suits.

68. Commonality: The claims of the class share common issues of law, including but not limited

to whether Defendant's prior or current policy regarding housing of transgender individuals—

policies that systemically affect all proposed class members from the moment they enter into

DOC's custody—violates equal protection and/or the District of Columbia Human Rights Act.

The resolution of these questions will drive the outcome of the litigation.

69. Typicality: The claims of Plaintiff are typical of those of the class as a whole, because Plaintiff

was in the District's custody at the time she filed this case, was subject to the same G Policy

that has continued to drive the housing placements of at least some proposed class members,

and faced the same type of discrimination—discrimination in custodial housing placements on the basis of gender identity and sex—that class members face or will face under both the G Policy and the H Policy.

70. Adequacy: Plaintiff is an adequate class representative who meets all the requirements of Rule 23(a)(4). She has no conflicts of interest in this case with other class members. She will fairly and adequately represent the interests of the class and understands the responsibilities of a representative. Among counsel for Plaintiff are attorneys with extensive experience with the factual and legal issues involved in representing individuals in jail and prison, in asserting constitutional rights, and/or in pursuing class actions. Counsel will vigorously pursue the interests of the class.

## CAUSES OF ACTION

### Claim 1: Fifth Amendment Equal Protection (via 42 U.S.C. § 1983)
(Plaintiff Sunday Hinton and proposed class members)

71. The Fifth Amendment guarantees equal protection of the laws to persons in the District of Columbia.

72. Through its transgender housing policies, DOC violated Ms. Hinton's equal protection rights, and is violating and will continue to violate the equal protection rights of the proposed class members:

    a. Under the G Policy—which has continued to drive housing placements even after it was superseded,  which DOC may be continuing to implement de facto in the absence of procedural safeguards against the coercion of transgender individuals in custody, and which DOC may formally reenact at any time—DOC's consideration of anatomy as either the default or the exclusive criterion in housing assignments for transgender people results in unequal treatment of transgender individuals as compared to cisgender

individuals on the basis of their gender identity and sex. DOC's focus on transgender individuals' genitalia for the purpose of assigning them to housing is not substantially related to any legitimate objective, much less an "exceedingly persuasive justification." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

b. Under the H Policy, DOC requires all transgender individuals to be placed in protective custody during intake simply because they are transgender, whereas cisgender individuals are not subject to the same punitive treatment. The singling out of transgender individuals for harsher conditions is not substantially related to any legitimate objective, much less an "exceedingly persuasive justification," *Virginia*, 518 U.S. at 533.

73. As a result of DOC's unconstitutional actions, proposed class members are suffering or are at imminent risk of suffering irreparable injury.

**Claim 2: District of Columbia Human Rights Act, D.C. Code § 2-1402.73**
(Plaintiff Sunday Hinton and proposed class members)

74. The District of Columbia Human Rights Act prohibits "a District government agency or office" from "limit[ing] or refus[ing] to provide any facility . . . to any individual on the basis of an individual's actual or perceived . . . gender identity or expression." D.C. Code § 2-1402.73.

75. The Department of Corrections is a District government agency or office providing housing facilities to incarcerated individuals.

76. DOC is violating the D.C. Human Rights Act through its transgender housing policies:

a. Under the G Policy—which has continued to drive housing placements even after it was superseded, which DOC may be continuing to implement de facto in the absence of procedural safeguards against the coercion of transgender individuals in custody, and which DOC may formally reenact at any time—DOC's consideration of anatomy

19

as either the default or the exclusive criterion in housing assignments for transgender people limits or denies access to housing facilities based on gender identity.

b. Under the H Policy, DOC requires all transgender individuals to be placed in protective custody during intake simply because they are transgender, thus denying them the same facilities and services that cisgender individuals receive and thereby discriminating based on gender identity.

77. As a result of the DOC's unlawful actions, proposed class members are suffering or are at imminent risk of suffering irreparable injury.

## RELIEF REQUESTED

WHEREFORE, Plaintiff and proposed class members respectfully request that the Court:

A. Certify the proposed class, designate Plaintiff as the Class Representative, and designate Plaintiff's counsel as Class Counsel;

B. Declare that Plaintiff's and class members' rights under the Fifth Amendment (equal protection) and the District of Columbia Human Rights Act have been violated;

C. Enter a preliminary injunction requiring Defendant to:

a. Refrain from placing any transgender individual in protective custody based on the person's transgender status, or based on any process, policy, or set of criteria only applicable to transgender individuals as opposed to those applicable to all individuals in DOC custody;

b. Refrain from using an individual's anatomy as the default or sole criterion in making housing assignments for transgender individuals in DOC custody;

c. Promptly offer to every transgender individual in DOC custody a Transgender Housing Committee hearing, which may be virtual or telephonic, and thereafter promptly move the individual to their new assigned unit; and

     d.  Provide appropriate procedural safeguards—including notice to and opportunity to consult with counsel and to have counsel present—for transgender individuals when signing housing preference forms and when participating in Transgender Housing Committee proceedings, in order to prevent coercion by DOC;

D.  Award costs to Plaintiff and the class; and

E.  Grant Plaintiff such further relief as this Court deems appropriate.

August 10, 2021                    Respectfully submitted,

/s/ Scott Michelman
Scott Michelman (D.C. Bar No. 1006945)
Megan Yan[*] (D.C. Bar No. 1735334)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff (D.C. Bar No. 1601047)
American Civil Liberties Union Foundation
   of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
202-601-4267
smichelman@acludc.org

/s/ Rachel Cicurel
Rachel Cicurel[*] (D.C. Bar No. 1024378)
Steven Marcus (D.C. Bar No. 1630882)
Public Defender Service for the District of Columbia
633 Indiana Avenue N.W.
Washington, D.C. 20004
Tel. 202-824-2774
Fax 202-824-2776
rcicurel@pdsdc.org

*Counsel for Plaintiff*[**]

---

[*] In accordance with D.D.C. Local Civil Rule 83.2(g), the attorneys whose names are marked with an asterisk above certify that: (i) they are members in good standing of the District of Columbia Bar; (ii) they are representing a petitioner who is indigent within the meaning of Local Rule 83.2(g), at no cost to petitioner; (iii) they have never been subject to disciplinary complaint or sanction by any court or other disciplinary authority; and (iv) they possess a copy of the Local Rules of this District and are familiar with the rules generally and as they pertain to this proceeding.

[**] Counsel wish to acknowledge the assistance of paralegal Elaine Stamp in the preparation of this filing.