UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUNDAY HINTON, | |
| Plaintiff, | |
| v. | Civil Action No. 21-1295 (JDB) |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

## MEMORANDUM OPINION

This case arises out of the District of Columbia's (the "District") policy regarding the housing of transgender individuals in the custody of its Department of Corrections ("DOC"). Plaintiff Sunday Hinton is a transgender woman who was detained in the men's unit of the D.C. Jail from April 26 to May 26, 2021.  She brought this action for a preliminary and permanent injunction on behalf of herself and a putative class of transgender individuals to challenge DOC's housing policy.  Although DOC amended its policy subsequent to the commencement of this action, Hinton insists that her claims remain viable because, even as amended, the policy unlawfully discriminates against transgender individuals in violation of the Equal Protection Clause of the U.S. Constitution and the D.C. Human Rights Act ("DCHRA").  She also insists that, notwithstanding her release from custody, her class claims are not moot because of their inherently transitory nature.

Hinton's motions for class certification and preliminary injunction are now fully briefed and ripe for this Court's consideration following a motions hearing held on August 24, 2021.  The Court will deny Hinton's motions for class certification and preliminary injunction without prejudice.  Due to the fluid nature of the putative prospective class, the Court will give Hinton the

opportunity to file a renewed motion for class certification with the benefit of pre-certification discovery and to amend her complaint, which may in turn preserve her forward-looking class-wide claims beyond the expiration of her individual stake in the outcome of this litigation.

## Background

### I.    Plaintiff Hinton's Detention

Plaintiff Sunday Hinton was brought into the custody of DOC on April 26, 2021.  Am. Class Action Compl. for Declaratory & Inj. Relief ("Am. Compl.") [ECF No. 32] ¶ 3.  Despite identifying herself as a transgender woman and requesting to be placed in a women's unit, Hinton was assigned to a men's unit pursuant to the DOC policy then in effect.  Id.  After spending approximately two weeks in that unit, Hinton filed the instant action on May 11, 2021 seeking a temporary restraining order ("TRO") and preliminary injunction mandating that DOC immediately transfer her to a women's unit.  Id. ¶ 4.  Hinton's complaint alleged that DOC policy housed transgender individuals in either a men's or women's housing unit based presumptively on their anatomy rather than their gender identity.  Compl. [ECF No. 1] ¶ 1.  Her complaint further alleged that this "policy of considering anatomy as either the default or the exclusive criterion in housing assignments for transgender people" constitutes discrimination on the basis of sex and gender identity in violation of the Equal Protection Clause and the DCHRA.  Id. ¶¶ 47, 52.  Hinton also sought certification to seek class-wide relief for "similarly situated transgender individuals" who are either currently housed in DOC facilities inconsistent with their gender identity, "or who will be detained in a DOC facility in the future."  Id. at 1.

According to Hinton, after she filed suit, DOC staff sought to obtain a waiver from her disclaiming her request to be housed in a women's unit in exchange for housing her in a cell with another transgender woman inside the men's unit.  Am. Compl. ¶¶ 5, 43–50.  Shortly thereafter,

Hinton was afforded a hearing with DOC's Transgender Housing Committee ("THC"), which resulted in her transfer to a women's unit.  Id. ¶¶ 5, 52.  On May 26, 2021—exactly one month after she was detained—Hinton was released from custody on order of the Superior Court of the District of Columbia.  See Notice (May 27, 2021) [ECF No. 18].

## II.    DOC Gender Classification & Housing Policies

Hinton's transfer into a women's unit and eventual release from custody are not the only factual circumstances that have changed since this case was first filed.  DOC has also changed its transgender housing policy.

### A.  The "G Policy"

Under the policy in place during Hinton's detention, DOC presumptively "classif[ied] an inmate who has male genitals as a male and one who has female genitals as a female, unless otherwise recommended by the [THC]."  See Gender Classification & Housing, DOC Policy & Procedure 4020.3G (eff. Oct. 15, 2019) (the "G Policy") [ECF No. 22-1] ¶ 2.a.  If an inmate self-identified as transgender or intersex, or if "[a]n inmate's gender identity, gender expression, or behavior differs from their assigned sex at birth," corrections staff were instructed to follow intake procedures designed to determine whether that inmate is transgender or intersex.  Id. ¶¶ 2.b., 9. Then, "[i]nmates identified as Transgender or Intersex shall be housed in a single cell in the intake housing unit consistent with the gender identified at intake for no more than seventy-two (72) hours, excluding weekends, holidays and emergencies, until classification and housing needs can be addressed by the [THC]."  Id. ¶ 10.b.

The THC, in turn, would conduct a hearing with the inmate and obtain the inmate's "opinion regarding . . . vulnerability in the general jail population of the male or female units," before attempting to reach a consensus decision regarding the inmate's housing "based on [the

inmate's] safety/security needs, housing availability, gender identity and sex at birth."  Id. ¶¶ 10.6, 11.b.  "[W]hen there is reason to believe the inmate presents a heightened risk to him/herself or to others or where the inmate fears he or she will be vulnerable to victimization," the G Policy provided that the inmate be placed in protective custody within whichever sex-based housing unit the THC deems appropriate.  Id. ¶ 11.f.  Finally, the THC's decision was submitted in writing to the warden for approval.  Id. ¶ 11.c.  If the warden disagreed with the THC's recommendation, the warden provided a written justification of her position to the director of DOC for final determination, and an inmate dissatisfied with his or her housing assignment had the right to administratively appeal.  Id. ¶ 11.d.  In all cases, whether a transgender inmate is housed consistent with anatomy or with gender identity, the G Policy provided that he or she "shall be housed in a single cell or with another Transgender or Intersex inmate in the[] assigned housing unit, no exceptions."  Id. ¶ 11.e.

According to Hinton, this policy was not followed in practice.  Instead, Hinton alleges, the policy as applied "contain[ed] a presumption" that transgender individuals "will be housed according to their anatomy—that is, a person who has 'male genitals' is housed in a men's unit and a person who has 'female genitals' is housed in a women's unit."  See Mem. in of Pl.'s Appl. for TRO & Mot. for Prelim. Inj. ("Pl.'s Br.") [ECF No. 4-1] at 1; Am. Compl. ¶¶ 25–28 ("If a detained transgender woman was deemed 'anatomically male,' for example, she would be housed in a men's unit regardless of her gender identity as a woman or her risk of sexual assault and harassment in a men's unit.").[1]  Moreover, Hinton alleges, "the THC ha[d] not met for more than

---

[1] According to Hinton, the presumption that inmates be housed according to their anatomy unless and until the THC determined otherwise resulted in housing "every transgender individual in DOC custody . . . according to their anatomy, at least until the THC meets."  Pl.'s Br. at 3.  At least on its face, the G Policy is not so clear on this point: it provides for housing "consistent with the gender identified at intake," and the intake procedures provide, among other possible means of gender identification, asking how the inmate self-identifies and administering a questionnaire.  See G Policy ¶¶ 9, 10.b.  But Hinton presented evidence from criminal defense attorneys who regularly

15 months" as of May 11, 2021, resulting in "transgender individuals detained at DOC facilities .

. . being housed according to the default presumption alone—strictly based on their anatomy."

Pl.'s Br. at 1.  Indeed, according to Hinton, since this suit was filed, DOC "housed at least four

other transgender individuals at odds with their gender identity despite their wishes, and . . .

pressured at least three (all transgender women) into signing statements stating they wished to be

housed with men" without conducting a THC hearing.  Am. Compl. ¶ 53.  Even when the THC

did meet pursuant to the G Policy, one THC member indicated to Hinton's counsel "that a person's

anatomy is a primary focus of the THC's analysis."  Id. ¶¶ 32, 35.

> B.  The "H Policy"

On June 17, 2021, the District amended the G Policy.  Under the new policy, rather than

presumptively classify an inmate's gender based on anatomy, "DOC shall house Transgender,

Intersex, or Gender Nonconforming inmates in male or female units based on their preference,

unless otherwise recommended by the [THC] and approved in accordance with this policy."

Gender Classification & Housing, DOC Policy & Procedure 4020.3H (eff. June 17, 2021) (the "H

Policy") [ECF No. 22-2] ¶ 2.a.  During intake, the H Policy provides that transgender inmates "be

housed in protective custody (voluntary or involuntary protective custody) in a single cell in the

intake housing unit consistent with the inmate's gender housing preference identified at intake."

Id. ¶ 10.a.  "[W]ithin twenty-four (24) hours [of intake], excluding weekends, holidays and

emergencies," DOC's Prison Rape Elimination Act ("PREA") Victim Services Coordinator must

conduct an initial safety and security assessment of a transgender inmate's housing preference.  Id.

Within seventy-two hours thereafter (again with the same exclusions), the H Policy directs the

---

represent clients in DOC custody suggesting that, in practice, anatomy was the sole criterion for housing.  See Decl.
of Tara Chen ("Chen Decl.") [ECF No. 4-3] ¶ 8; Decl. of Deborah M. Golden ("Golden Decl."). [ECF No. 4-4] ¶ 2.
As the G Policy is no longer in place, and given Hinton's factual assertions casting doubt on whether the letter of the
G Policy was actually followed in practice, the Court need not resolve this uncertainty.

THC to "conduct a formal classification and housing needs assessment" for the inmate.  Id.  Unlike the G Policy, the H Policy requires the THC to "house the inmate in the gender housing unit the inmate prefers—whether it corresponds to the inmate's gender identity or sex assigned at birth— unless the Committee has identified safety and security concerns with the inmate's preferred housing placement."  Id. ¶ 11.b.  From there, the H Policy largely tracks the G Policy with respect to the THC's written decision, review by the warden, and determination by the DOC director in case of disagreement.  See id. ¶ 11.d.

Once again, Hinton alleges that DOC has failed to follow its own policy since the H Policy took effect.  For example, Hinton points out that in the first month after the H Policy went into effect, three transgender inmates who had been housed consistent with their anatomy under the G Policy were not informed of the new policy, given a THC hearing, or assigned new housing.  Am. Compl. ¶ 63; Pl.'s Reply in Supp. of Mots. for Class Cert. & Prelim. Inj. ("Pl.'s Reply") [ECF No. 26] at 14.  One of those individuals, Latisa Moorman, was released from custody on July 9, less than a month after the H Policy took effect, and—unaware the policy had changed—did not request a THC hearing prior to her release.  See Suppl. Decl. of Latisa Moorman [ECF No. 26-2] ¶¶ 2–3, 6.  Another, Courtney Phillips, stated that she was not made aware of the H Policy when it went into effect and was not afforded a THC hearing despite requesting one on multiple occasions.  See Second Suppl. Decl. of Courtney Phillips ("2d Suppl. Phillips Decl.") [ECF No. 36-1] ¶¶ 7–10.  However, the District presented evidence that Phillips's purported hearing request did not in fact request a hearing regarding housing and instead pertained to clothing.  See Def.'s Resp. to Suppl. Decl. [ECF No. 37] at 2–3.  Ultimately, Phillips was afforded a THC hearing and, as a result, was subsequently transferred to the general population of the women's unit consistent with her preference and gender identity.  See Def.'s Resp. to Ct.'s Sept. 8, 2021 Order ("Def.'s 2d Resp. to

Ct.") [ECF No. 38].   As for the third inmate identified by Hinton, Jessica Watkins, she had apparently not requested a THC hearing as of the August 24 motions hearing, though it is not clear why.  See Rough Tr. of Hr'g (Aug. 24, 2021) ("Hr'g Tr.") at 31:8–18.[2]  What is clear from the record is that Ms. Watkins was made aware of the H Policy, albeit by plaintiff's counsel, around July 9.  See id. at 32:17–33:25: Suppl. Decl. of Jessica Watkins [ECF No. 26-4] ¶ 5.

For its part, the District asserts that three different transgender individuals who were in DOC custody at the time the H Policy took effect requested and received THC hearings.  See Def.'s Resp. to Ct.'s Aug. 5, 2021 Order ("Def.'s Resp. to Ct.") [ECF No. 34] at 3–4.  All three of those inmates identified as transgender women but were ultimately placed in the men's unit for different reasons.  Two requested to be housed consistent with their sex at birth: one was placed in the general population of the men's unit, and the other was placed first in the men's mental health unit "per the recommendation of medical staff" and "later transferred to the protective custody men's unit, at her request."  Id. at 4.  The third inmate identified as transgender requested to be placed in the women's unit but, due to a lack of "any indication that she currently identifies as transgender" and "because [she] had never previously identified as transgender during several previous periods in DOC custody," she too was placed in the men's unit by the THC and did not appeal that decision.  Id. at 4–5.

### III.    Procedural Background

Hinton filed her initial complaint and motions for TRO, preliminary injunction, and class certification on May 11, 2021.  See Compl.; Mot. for TRO [ECF No. 3]; Mot. for Prelim. Inj. [ECF No. 4]; Mot. for Class Cert. & Appointment of Class Counsel ("Pl.'s Mot. for Class Cert.") [ECF

---

[2] Citations to the transcript of the August 24 hearing on plaintiff's motions are to a rough draft of the transcript.  When finalized, the transcript will be posted to the docket.  Discrepancies between the rough transcript and the final version may exist.

No. 7].  After soliciting an expedited response from the District to Hinton's TRO motion, this Court held a telephone conference on May 14, 2021.  <u>See</u> Min. Order (May 11, 2021); Min. Order (May 13, 2021).  By the time of that conference, the THC had agreed to transfer Hinton to the women's unit.  <u>See</u> Am. Compl. ¶ 52.

The Court permitted Hinton to supplement her initial motions in light of her transfer to the women's unit, Min. Order (May 17, 2021), which she did on June 1, <u>see</u> Pl.'s Suppl. Mem. in Supp. of Prelim. Inj. & Class Cert. [ECF No. 19]  By then, Hinton had already been released from DOC custody, but she affirmed that she was "still able and fully intend[ed] to represent the class in this lawsuit."  <u>Id.</u> at 3.  Approximately two weeks after Hinton submitted her supplemental brief—and one day before the District filed its oppositions to Hinton's motions for preliminary injunction and class certification—DOC enacted the H Policy.  According to the District, "[t]he newly enacted policy . . . moots the case" and, in any event, precludes Hinton from "mak[ing] the requisite showing for a preliminary injunction."  <u>See</u> Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. ("Def.'s Opp'n to PI") [ECF No. 22] at 2.

The parties then attempted—ultimately without success—to reach an agreement to address plaintiff's concerns about the H Policy.  <u>See</u> Pl.'s Consent Mot. for Extension of Time (June 22, 2021) [ECF No. 24]; Pl.'s Consent Mot. for Extension of Time (July 2, 2021) [ECF No. 25].  Eventually, on July 16, Hinton filed her reply brief.  In it, Hinton took issue with the new policy inasmuch as it requires transgender inmates to remain in protective custody in the intake unit for as long as four calendar days—excluding weekends, holidays, and emergencies—while a final housing determination is made with the input of the PREA Victim Services Coordinator and the THC.  <u>See</u> Pl.'s Reply at 1–2; H Policy ¶ 10.  She also asserts that "discriminatory classifications made pursuant to the G Policy persist despite the H Policy" because at least three transgender

individuals remained housed inconsistently with their gender identity.  See Pl.'s Reply at 14.  In support of her reply brief, Hinton attached three new declarations from those transgender inmates purporting to supplement the factual record in the case.

Because Hinton expanded the factual record, the Court offered the District the opportunity to file a surreply.  The District likewise attached an additional affidavit to its brief.  See Def.'s Surreply in Further Opp'n to Pl.'s Mots. for Prelim. Inj. & Class Cert. ("Def.'s Surreply") [ECF No. 27]; Decl. of Kathleen Jo Landerkin [ECF No. 27-1].  The Court granted Hinton leave to file one more affidavit in response to the District's surreply and to amend her complaint to more closely tailor her allegations to the H Policy.  See Order (Aug. 3, 2021) [ECF No. 29].

Hinton's amended complaint was filed on August 10.  In it, Hinton insists that the H Policy "imposes a new discriminatory measure" by requiring all transgender inmates to remain "in protective custody during an intake period that can last a week or more," while "[c]isgender inmates in the intake process are not housed in protective custody" absent individualized need. Am. Compl. ¶¶ 57–59.  As a result, during the intake period, transgender inmates "are shackled whenever they leave the intake unit, including for legal visits and medical care."  Id. ¶ 60.  Hinton further takes issue with the H Policy's failure to "include safeguards against coercion by DOC officials," and DOC's failures to inform other transgender inmates of the policy change and remedy "the discriminatory housing placements made under the G Policy [that] have persisted." Id. ¶¶ 62–64.  Finally, Hinton expresses doubts about the finality of the H Policy, noting that "DOC retains authority to change its transgender housing policy at any time, and it has done so three times in the past four years."  Id. ¶ 65.  Hence, Hinton's causes of action for unlawful discrimination on the basis of sex and gender identity are leveled against both the H Policy's protective custody provision and the residual effects of the G Policy, which she says "has continued

to drive housing placements even after it was superseded, which DOC may be continuing to implement de facto in the absence of procedural safeguards . . . , and which DOC may formally reenact at any time." See id. ¶¶ 72, 76.

Among other requested relief, Hinton seeks an order from this Court certifying a proposed class and prohibiting DOC from (1) "using an individual's anatomy as the default or sole criterion in making housing assignments for transgender individuals in DOC custody," or (2) placing transgender inmates in protective custody "based on any process, policy, or set of criteria only applicable to transgender individuals as opposed to those applicable to all individuals in DOC custody." Id. at 20.  She further asks the Court to direct DOC promptly to convene THC hearings for all transgender individuals currently in custody and transfer them as needed, and "[p]rovide appropriate procedural safeguards—including notice to and opportunity to consult with counsel and to have counsel present— . . . in order to prevent coercion by DOC." Id. at 20–21.

Hinton's motions for class certification and preliminary injunction have been fully briefed, and the Court heard oral argument on August 24, 2021.  As is clear from the arguments put forward by both parties, the issue of class certification is tightly connected to the merits of both plaintiff's motion for a preliminary injunction and the District's mootness arguments.  Indeed, in response to the District's contention that her claims are moot, Hinton relies on a mootness exception that applies exclusively to class actions.  The Court finds that Hinton has not carried her evidentiary burden under Rule 23 to support the certification of a class at this point.  However, the Court does not conclude that this deficiency is irremediable.  Therefore, as courts have done in other cases where plaintiff's Rule 23 showings falter on evidentiary rather than structural grounds, the Court will permit Hinton to attempt to cure the infirmities discussed below in a renewed motion for class certification.  Meanwhile, the Court will decline to decide whether Hinton's release from custody

has mooted the entire case, as that issue is bound up with the question of class certification. For now, the Court will only dismiss as moot the claims asserted against the now-defunct G Policy and deny Hinton's motion for preliminary injunction in light of her release from custody.  But the Court will reject the District's argument that the mere enactment of the H policy rendered this action entirely moot and will allow this case to proceed for further consideration of class certification.

**Mootness**

The District's principal arguments against both class certification and a preliminary injunction are premised on the assertion that Hinton's claims are moot.  Although the District did not move to dismiss the complaint, its mootness arguments function as a motion to dismiss since "[f]ederal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies."  Conservation Force, Inc. v. Jewell, 733 F.3d 1200, 1204 (D.C. Cir. 2013 (quoting Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983)). Generally, "[a] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n, 628 F.3d 568, 576 (D.C. Cir. 2010) (quoting Cnty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)). "But the bar for maintaining a legally cognizable claim is not high: '[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.'"  Grimm v. Gloucester Cnty. Sch. Bd., 972 F.3d 586, 604 (4th Cir. 2020) (quoting Chafin v. Chafin, 568 U.S. 165, 172 (2013)), cert. denied, No. 20-1163, 2021 WL 2637992 (June 28, 2021).  Only "[i]f events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot."  McBryde v. Comm. to Review Cir. Council Conduct & Disability Orders of

the Jud. Conf. of the U.S., 264 F.3d 52, 55 (D.C. Cir. 2001) (citing Church of Scientology of Cal.
v. United States, 506 U.S. 9, 12 (1992)).

"The initial 'heavy burden' of establishing mootness lies with the party asserting a case is
moot, but the opposing party bears the burden of showing an exception applies[.]" Honeywell
Int'l, 628 F.3d at 576 (citations omitted).[3]  The District attempts to carry its initial burden with two
independent mootness arguments.  First, the District asserts that "the [H] Policy fully addresses
the material aspects of the relief requested."  Def.'s Opp'n to PI at 8.  Specifically, the District
argues that the H Policy's eradication of the default assumption that inmates be housed according
to their anatomy leaves no further relief for transgender inmates to seek.  Id. at 8–9.  The District's
other mootness argument is premised on the fact that Hinton was herself released from custody
and can therefore no longer press a live claim for this Court to adjudicate.  Id. at 11.  The Court
will address each mootness argument in turn.[4]

## I.       The Replacement of the G Policy with the H Policy Does Not Moot the Case

The District contends that the H Policy "encompasses plaintiff's requested relief" and
renders the entire case moot.  Id. at 8.  In response, Hinton seeks to preserve her claims against the
G Policy by invoking the "voluntary cessation" exception to mootness, see Pl.'s Reply at 11–14,
which holds that, "as a general rule, 'voluntary cessation of allegedly illegal conduct does not
deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot,'"

---

[3] When assessing mootness, a court "may also consider material beyond the allegations in the complaint . . .
so long as it accepts the factual allegations in the complaint as true."  Holland v. ACL Transp. Servs., 815 F. Supp.
2d 46, 52 (D.D.C. 2011) (citing Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253–54
(D.C. Cir. 2005)).

[4] Hinton's initial complaint alleged that she was denied due process as an individual (rather than on behalf
of the purported class).  Compl. ¶¶ 54–59.  She now concedes that "[h]er release moots the due process claim," Pl.'s
Reply at 9 n.2, and she omitted that claim from the Amended Complaint.  Hence, the Court's mootness analysis
focuses on Hinton's Equal Protection and DCHRA class-wide claims, each of which turn on the same factual
allegations.  See Am. Compl. ¶¶ 72, 76.

Davis, 440 U.S. at 631 (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953)).  She further argues that the H Policy does not moot the case because it "continues to discriminate against transgender individuals and lacks procedural safeguards this litigation has shown to be necessary." Pl.'s Reply at 6–7.  While the Court agrees with the District that Hinton's claims against the G Policy cannot go forward, the claims against the H Policy remain viable for now.

    A.  Claims Against the Superseded G Policy Are Moot

The voluntary cessation exception to mootness disfavors dismissal of claims a defendant purposely "moots" when such dismissal would leave the defendant "free to return to his old ways." See Zukerman v. U.S. Postal Serv., 961 F.3d 431, 442 (D.C. Cir. 2020) (quoting W.T. Grant, 345 U.S. at 632).  To protect against such an unfair and inefficient outcome, the voluntary cessation doctrine prohibits courts from "conclud[ing] that a defendant's voluntary cessation of disputed conduct renders a case moot unless 'the party urging mootness demonstrates that (1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely or irrevocably eradicated the effects of the alleged violation.'"  Id. (quoting Nat'l Black Police Ass'n v. District of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997)).  Where the defendant is a governmental agency and its purported "voluntary cessation" is effectuated by superseding a challenged law or regulation, the "challenge to [the] superseded law is rendered moot unless 'there is evidence indicating that the challenged law likely will be reenacted.'"  See Init. & Referendum Inst. v. U.S. Postal Serv., 685 F.3d 1066, 1074 (D.C. Cir. 2012) (emphasis added) (quoting Nat'l Black Police Ass'n, 108 F.3d at 349).  Furthermore, "[t]he mere power to reenact a challenged law is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists."  Id. (quoting Nat'l Black Police Ass'n, 108 F.3d at 349).

As a threshold matter, the Court begins its mootness inquiry by "defin[ing] the wrong that the defendant is alleged to have inflicted" in order to assess the degree to which that wrong may recur by the formal or informal reenactment of the G Policy.  See Zukerman, 961 F.3d at 442 (quoting Clarke v. United States, 915 F.2d 699, 703 (D.C. Cir. 1990) (en banc)).  Hinton alleges two ongoing harms attributable to the G Policy, which she contends can be redressed by order of this Court.  First, she asserts that "discriminatory classifications made pursuant to the G Policy persist" as to transgender individuals who continue to be housed according to their sex at birth under the G Policy's presumption.  Pl.'s Reply at 14.  Second, she states that future transgender inmates "may also continue to experience the effects of the District's former presumption," because DOC's alleged "coercive maneuvers, past failure to abide by its own policy, and frequent revisions of the policy" suggest that it may not abandon its past discriminatory conduct.  Id. at 13–14.  She proposes to cure these harms by an order mandating certain procedural safeguards to the THC process.  See id. at 14.

On her first point, the record makes clear that no such harm is ongoing.  All transgender individuals who were in DOC custody before the H Policy went into effect have now had THC hearings under the presumption-free guidelines of the H Policy.  See Def.'s Resp. to Ct. at 3–5; Def.'s 2d Resp. to Ct.  To be sure, three of those hearings—for prisoners referred to as Residents A, B, and C—resulted in their being housed according to their sex at birth.  Def.'s Resp. to Ct. at 4.  But there is no evidence to suggest that the THC's housing decisions for those prisoners were based on the G Policy's presumption; instead, the record is clear that the THC housed them based on individualized assessments of each.  See id.  As for Courtney Phillips, the final pre-H Policy transgender prisoner to receive a THC hearing, the THC determined on September 8 that she be housed in the general population of the women's unit consistent with her gender identity and

preference.  See Def.'s 2d Resp. to Ct.  Hence, there appear to be zero transgender prisoners currently housed according to the G Policy's presumption, "completely . . . eradicat[ing]" any current, ongoing effects of the G Policy that might be redressed by this Court.

As for future transgender inmates, Hinton asserts that "DOC's behavior in this litigation" suggests it is likely to continue discriminating against transgender prisoners by housing them pursuant to their sex at birth, thereby reviving the G Policy either de jure or de facto.  See Pl.'s Reply at 12.  This forward-looking harm, though, is too speculative to preserve this Court's jurisdiction to decide the legality of the superseded G Policy.  To be sure, the Court is troubled by some of the actions and representations apparently made by DOC staff during the pendency of this litigation.  For instance, according to Hinton, she was told in no uncertain terms by THC member Traci Outlaw that her "only option was to be housed in a men's unit," see Second Suppl. Decl. of Sunday Hinton ("2d Suppl. Hinton Decl.") [ECF No. 16-1] ¶ 2, despite the G Policy's requirement that the THC "take[] into consideration" a transgender inmate's "opinion regarding his or her vulnerability in the general jail population of the male or female units," G Policy ¶ 11.b.  Another THC member, Charlene Reid, stated in her sworn affidavit that Hinton "expressed her desire to be housed . . . with her friend, another trans woman inmate, in a men's housing unit," Decl. of Charlene Reid [ECF No. 14-1] ¶¶ 4, 10, but she failed to mention that Hinton had first expressed "that [she] wanted to be housed in a women's unit" and "only suggested being housed with another transgender person after [she] was told that a women's unit was not an option," 2d Suppl. Hinton Decl. ¶ 5.  But none of this conduct rises to the level of evidence suggesting DOC will reenact or continue to implement the G Policy.

For one, all of the above conduct occurred before the H Policy took effect, while Hinton was still in DOC custody.  Plaintiff attempted to level similar allegations post-H Policy against

DOC's treatment of Courtney Phillips, stating that Phillips requested and was denied a THC hearing after learning of the new H Policy, see 2d Suppl. Phillips Decl., but those allegations were not substantiated.  The District submitted evidence that Phillips had not in fact requested a THC hearing to change her housing assignment prior to the filing of her supplemental declaration, Def.'s Resp. to Suppl. Decl., and when Phillips was afforded a THC hearing, she was housed according to her gender identity, see Def.'s 2d Resp. to Ct.

Hinton's other arguments in support of her contention that DOC will revive the G Policy are also unavailing.  The Court does not infer a likelihood of recurrence of the G Policy from the fact that DOC changed its policy in response to this litigation.  Indeed, the record suggests that DOC sought in good faith to improve on the G Policy, and the parties even engaged in good-faith discussions about the merits of the H Policy after its enactment.  See Pl.'s Consent Mot. for Extension of Time (June 22, 2021); Pl.'s Consent Mot. for Extension of Time (July 2, 2021).  And finally, the Court is not particularly troubled by the fact that DOC's transgender housing policy has "been revised three times in the past four years."  See Pl.'s Reply at 12–13.  Courts have recognized that "cases involving transgender status implicate a fast-changing and rapidly-evolving set of issues that must be considered in their own factual contexts."  Grimm, 972 F.3d at 609 n.9 (quoting Evancho v. Pine–Richland Sch. Dist., 237 F. Supp. 3d 267, 287 (W.D. Pa. 2017)).  The carceral context is no different, and the Court declines to look askance at DOC's efforts to adjust its policies to fit evolving societal norms and understandings around the issues facing transgender individuals in its custody.

In sum, the Court finds that the individualized THC hearings—applying the H Policy's standards—afforded to every transgender individual currently in DOC custody have cured any harm caused by the G Policy's presumption of anatomy-based housing.  And because Hinton has

not shown a likelihood that DOC will reenact the G Policy notwithstanding its supersession by the H Policy, the Court will dismiss her claims against the G Policy as moot.

However, "the fact that one aspect of a lawsuit becomes moot does not automatically deprive a court of jurisdiction over remaining, live aspects of the case." Zukerman, 961 F.3d at 443 (quoting Foretich v. United States, 351 F.3d 1198, 1210 (D.C. Cir. 2003)). Hence, the Court will proceed to analyze the District's mootness argument as to Hinton's claims against the H Policy.

B.  Claims Against the H Policy Are Not Moot

The District asserts that Hinton's claims against the H Policy must be dismissed as moot as well because the H Policy "fully addresses the material aspects of the relief requested" in her initial complaint.  Def.'s Opp'n to Pl's Mot. for Class Cert. ("Def.'s Opp'n to Class Cert.") [ECF No. 23] at 8.  The District complained in its surreply that Hinton improperly sought "to supplement her Complaint, which is based on a factual premise that is no longer accurate, through a reply brief in support of her motions for a preliminary injunction and class certification."  Def.'s Surreply at 4.

The Court already addressed the District's allegation of improper amendment when it granted Hinton leave to amend her complaint because "the factual context surrounding this case . . . evolved substantially since the original complaint was filed."  Order (Aug. 3, 2021) at 3.  That amended complaint is now in effect and it challenges the H Policy directly.  And Hinton charges that, because the H Policy automatically places transgender individuals—but not cisgender individuals—into protective custody during intake, "DOC is still subjecting transgender people to a unique disadvantage not applicable to cisgender people" in violation of the Equal Protection Clause and the DCHRA.  Pl.'s Reply at 9–10.  Regardless whether protective custody at intake

constitutes "a unique disadvantage," let alone an unconstitutional one, Hinton is plainly correct that the replacement of the G Policy by the H Policy does not go so far as to foreclose allegations of continued discrimination against transgender inmates as a class, which she properly alleges in her amended complaint.   Were the Court to follow the District's suggestion—to ignore the arguments advanced in Hinton's reply brief and dismiss the entire case as moot rather than allow for amended pleadings—it might well result in new, duplicative litigation against the H Policy and the needless expenditure of limited judicial resources.   See Pub. Emps. for Env't Resp. v. Nat'l Park Serv., Civ. A. No. 19-3629 (RC), 2021 WL 1198047, at *1, *7 (D.D.C. Mar. 30, 2021) (granting plaintiffs leave to amend complaint to challenge superseding policy where "supplemental complaint will allow the Court to focus on the complete set of issues in this controversy that are live and ready for adjudication, allowing for a comprehensive—not piecemeal—resolution"). Hence, the Court finds that this case is not mooted by the enactment of the H Policy: claims against the H Policy remain live, for now, subject to the further limitations discussed below.

## II.     Whether Hinton's Release Moots the Case Depends on Class Certification

The District's other mootness argument—that this action was mooted by Hinton's release from custody—requires an entirely separate analysis.   Whereas the H Policy's effects on the vitality of the claims raised in this case can be assessed regardless of class certification, whether Hinton's release from custody moots her (now-narrowed) claims against the H Policy ultimately hinges on whether this case can proceed as a class action.   And although a Court must ordinarily resolve any dispute over its Article III jurisdiction to decide a case before reaching the merits, the Supreme Court has recognized an exception where "class certification issues are . . . 'logically antecedent' to Article III concerns." Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 612 (1997)).   This Court concludes that this

exception applies here for the following reasons and will therefore address class certification before ruling on the District's second mootness challenge.

In putative class actions, "at least one named plaintiff must keep her individual dispute live until [class] certification, or else the class action based on that claim generally becomes moot" absent an applicable mootness exception. J.D. v. Azar, 925 F.3d 1291, 1307 (D.C. Cir. 2019) (citing United States v. Sanchez-Gomez, 138 S. Ct. 1532, 1538 (2018)). It is undisputed that Hinton was released from DOC custody, so her "individual dispute" with DOC is moot.[5] "Normally, a prisoner's transfer or release from a prison moots any claim [s]he might have for equitable relief arising out of the conditions of [her] confinement in that prison." Scott v. District of Columbia, 139 F.3d 940, 941 (D.C. Cir. 1998). Indeed, Hinton appears to concede as much. See Pl.'s Reply at 1 ("[I]n spite of Ms. Hinton's release, claims on behalf of the class remain live under the 'inherently transitory' exception to mootness." (emphasis added)). For this reason, Hinton cannot prevail on her motion for preliminary injunction construed on an individual basis. See, e.g., Pinson v. U.S. Dep't of Just., 177 F. Supp. 3d 474, 477–78 (D.D.C. 2016) (denying without prejudice prisoner's preliminary injunction motion as moot following his transfer out of facility where he was allegedly subject to unconstitutional conditions); Brown v. Fed. Bureau of Investig., 793 F. Supp. 2d 368, 383–84 (D.D.C. 2011) (same).

Nevertheless, Hinton may still proceed to seek class-wide injunctive relief if she can satisfy her burden to show that a mootness exception applies. Hinton invokes the "inherently transitory" exception to mootness,[6] whereby a court may exercise jurisdiction over a class action

---

[5] Going forward, since only claims against the H Policy's use of mandatory protective custody at intake may proceed, a class member's "individual dispute" will presumably expire when he or she is released from protective custody.

[6] Hinton does not (and could not) assert the "voluntary cessation" exception, as it was not defendant who released her from custody. Instead, that decision was made by a D.C. Superior Court Judge independent of Hinton's claims here. See Notice (May 27, 2021).

notwithstanding a named plaintiff's individual claims becoming moot prior to class certification. See Pl.'s Reply at 7–8. "Because the class possesses a concrete legal interest, the mootness of individual claims does not affect the ability of representatives to litigate a controversy between the defendants and absent class members." J.D., 925 F.3d at 1308 (citing Sosna v. Iowa, 419 U.S. 393, 399 (1975)). Under this doctrine, district courts are permitted to engage in some judicial sleight of hand and "'relate [a] certification motion back' to a date when the individual claims were live," provided the requirements of the exception are met.[7] Id. (alteration in original) (quoting Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 71 & n.2 (2013)); see also, e.g., Gerstein v. Pugh, 420 U.S. 103, 110 n.11 (1975); Sosna, 419 U.S. at 399–402. But a class does not legally become a "class" until the court grants class certification. Id. at 399 ("When the District Court certified the propriety of the class action, the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by appellant."). And "the 'inherently transitory' exception does not apply outside the class action context." Ramirez v. U.S. Citizenship & Immigr. Servs., 338 F. Supp. 3d 1, 35 (D.D.C. 2018) (citing United States v. Sanchez-Gomez, 138 S. Ct. 1532, 1538 (2018)). So if there is no certifiable class, the inherently transitory exception to mootness a fortiori cannot apply.

For reasons discussed below, the Court will deny Hinton's motion for class certification for failure to satisfy Rule 23's numerosity requirement. It must also therefore deny her motion for a preliminary injunction. However, the Court will decline to rule on the District's mootness challenge at this time, as the Court will deny Hinton's motion for class certification without prejudice and allow her—and/or any additional or substitute plaintiffs who may subsequently join

---

[7] Whether the exception applies depends "(i) whether the individual claim might end before the district court has a reasonable amount of time to decide class certification, and (ii) whether some class members will retain a live claim at every stage of litigation." J.D., 925 F.3d at 1311.

this litigation—to seek to supplement the record and file a renewed motion for class certification. If granted, a certified class might then be able to rely on the inherently transitory exception to press its constitutional and statutory challenges to the H Policy.  Mootness thus turns on the "logically antecedent" question of class certification, and so, while that question remains pending, the Court will defer a decision on mootness to avoid premature dismissal.  Cf. U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 404 (1980) (holding that "an action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim, even though class certification has been denied," pending appeal of the denial decision, and that if "a class subsequently is properly certified, the merits of the class claim then may be adjudicated").  Stated differently, the class claims alleged in the Amended Complaint remain alive at the moment even though Hinton's individual dispute with DOC is moot.

Because Rule 23's "requirements must be interpreted in keeping with Article III constraints," Ortiz, 527 U.S. at 831 (quoting Amchem, 521 U.S. at 612–13), it bears explaining why the denial of class certification at this time does not divest this Court of Article III jurisdiction over the case.  The Court's retention of jurisdiction rests on the distinction between mootness and standing, which comprise independent though related doctrines applicable at different stages of litigation.  Standing simply requires "that plaintiffs have suffered a concrete injury caused by the defendant and capable of judicial redress."  D.L. v. District of Columbia, 302 F.R.D. 1, 19 (D.D.C. 2013), aff'd, 860 F.3d 713 (D.C. Cir. 2017); see also Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).  "Events subsequent to the filing of the complaint may moot the plaintiffs' claims, but the plaintiffs do not lose standing," D.L., 302 F.R.D. at 19, which is "assessed as of the time a suit commences," id. (quoting Del Monte Fresh Produce Co. v. United States, 570 F.3d 316, 324 (D.C. Cir. 2009)).  The District has not raised any deficiencies as to Hinton's standing.  And without

performing a complete analysis of Article III standing here, the Court is satisfied that Hinton had standing to press her claims at the filing of both her initial and amended complaints.

When her initial complaint was filed, Hinton was in DOC custody being held in the men's unit pursuant to the G Policy.  Clearly, she had standing to sue to enjoin the G Policy at that time.  See Cnty. of Riverside v. McLaughlin, 500 U.S. 44, 50–51 (1991).  The question of standing is a closer call with respect to the filing of the amended complaint on August 1, 2021, by which time Hinton was no longer in custody and had not been subjected to the H Policy's mandatory protective custody provision that she now purports to challenge.[8]  Hence, the question arises whether, at the time of the amended complaint, Hinton had "show[n] that [s]he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and [that] the injury or threat of injury [was] both real and immediate, not conjectural or hypothetical."  City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (internal quotation marks and citation omitted).  As mentioned, Hinton already sustained an alleged injury as the result of the G Policy; the question is whether that injury—or the likelihood of a future injury—gave her standing to challenge the H Policy at the time she filed her amended complaint.

"Courts generally agree that, 'when the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely that the injury will occur again,' and it is consequently more likely that plaintiffs have standing to pursue equitable relief."  Does I Through

---

[8] The policy change also bears on Hinton's ability to meet Rule 23(a)(3)'s typicality requirement.  Whereas standing simply requires that the class representative demonstrate an injury in fact, typicality requires that the representative "suffered a similar injury from the same course of conduct" as other class members.  Bynum v. District of Columbia, 214 F.R.D. 27, 34 (D.D.C. 2003).  As the District points out, "current transgender inmates and future transgender inmates are subject to the new amended [H Policy]," which was not in place during Hinton's incarceration.  See Def.'s Opp'n to Class Cert. at 10.  The Court need not decide whether Hinton has satisfied typicality here because she has failed to satisfy numerosity, but the same questions surrounding Hinton's standing to challenge the H Policy also might affect her ability to serve as a "typical" representative of a purported class of plaintiffs challenging the H Policy.

III v. District of Columbia, 216 F.R.D. 5, 11 (D.D.C. 2003) (quoting 31 Foster Children v. Bush, 329 F.3d 1255, 1265–66 (11th Cir. 2003)).  More specifically, a plaintiff may "demonstrate that [an] injury is likely to recur . . . where the harm alleged is directly traceable to a written policy" because "there is an implicit likelihood of its repetition in the immediate future."  Armstrong v. Davis, 275 F.3d 849, 861 (9th Cir. 2001) (citing Gomez v. Vernon, 255 F.3d 1118, 1127 (9th Cir. 2001)), abrogated on other grounds by Johnson v. California, 543 U.S. 499 (2005).  Here, it is undisputed that the harm alleged by Hinton "stemmed from" the G Policy.  See id.; Melendres v. Arpaio, 695 F.3d 990, 998 (9th Cir. 2012) (citing Armstrong, 275 F.3d at 861).  Hinton further alleged in the amended complaint that the G Policy's discriminatory effects against transgender prisoners survived through the H Policy.  See Am. Compl. ¶¶ 64.  The amended complaint describes the H Policy's "new discriminatory measure" as one piece of "DOC's unconstitutional transgender housing policies" which "expose every transgender individual in [DOC] custody," including Hinton, "to discrimination."  Id. ¶¶ 7, 9.

These allegations are sufficient to establish that Hinton's injury—albeit directly attributable to the G Policy—is fairly traceable to a discriminatory thread that runs through DOC's written transgender housing policies.  Moreover, Hinton "still faces criminal charges, and if she is convicted and receives a custodial sentence, she will go right into DOC custody where she will face the H Policy."  Hr'g Tr. 8:25–9:2.  This case is thus distinguishable from the Lyons line of cases denying standing where "the prospect of future injury rest[s] 'on the likelihood that [plaintiffs] will again be arrested for and charged with violations of the criminal law.'"  See Lyons, 461 U.S. at 102 (quoting O'Shea v. Littleton, 414 U.S. 488, 496 (1974)).  And the likelihood that

Hinton's alleged injuries attributable to the DOC transgender housing policy will recur was "more than conjecture" when she amended her complaint.  See Lyons, 461 U.S. at 107.[9]

In sum, the Court concludes that Hinton "still ha[s] standing to litigate [her] claims" that DOC's transgender housing policies violate the Equal Protection Clause and the DCHRA.  See D.L., 302 F.R.D. at 19.  And even though Hinton's release precludes her from obtaining a preliminary injunction as an individual for the reasons discussed below, the ongoing possibility that a class will be certified to litigate its "concrete legal interest" in the legality of DOC's transgender housing policy set forth in the H Policy keeps the flame of this case burning for now.  See J.D., 925 F.3d at 1308.

## Class Certification

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348 (2011) (quoting Califano v. Yamasaki, 442 U.S. 682, 700–01 (1979)).  In order to qualify for such exceptional treatment and obtain class certification, Federal Rule of Civil Procedure 23 requires that a plaintiff show:

> (1) the class is so numerous that joinder of all members is impractical;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

---

[9] If Hinton were to join or substitute other plaintiffs who were subjected to the H Policy, what is now something of a close call on standing would be better settled.  Cf. Does I Through III, 216 F.R.D. at 11 (rejecting standing to challenge "new policy" where "plaintiffs neither claim that they have been injured pursuant to that policy, nor that anyone has been injured thereunder" and instead merely sought to "challeng[e] isolated decisions by District decision-makers").

Fed. R. Civ. P. 23(a).   Further, a plaintiff seeking class certification to pursue a claim for declaratory or injunctive relief must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The Court will examine each of these requirements in turn, but first it must address some preliminary problems with the current class definition and salvage a sub-class in conformity with the Court's ruling on mootness.

Hinton's proposed class consists of "all transgender individuals who currently reside in a DOC housing unit that does not accord with their gender identity, or who will be detained in a DOC facility in the future."  Am. Compl. ¶ 66.  As discussed above, the claims of "all transgender individuals who currently reside in a DOC housing unit that does not accord with their gender identity" are moot.  The record indicates that there are at most four trans women housed in the men's unit.  As noted above, Jessica Watkins never requested a THC hearing or to be re-housed. And the three other unnamed trans inmates described by the District were housed in the men's unit pursuant to individualized determinations by the THC rather than the G Policy's anatomical-housing presumption or any other overarching DOC policy.  See Def.'s Resp. to Ct. at 4.  Of those three, one requested to be placed there, one was recommended for the mental health unit by medical staff, and the third posed individual concerns that resulted in her placement in protective custody.  Id.  None has appealed her housing determination or otherwise indicated any ongoing injury.  Id. at 2.  Hence these individuals may not be included in the class for want of live claims.[10]

---

[10] As for Courtney Phillips, she would presumably have fallen into the proposed class definition before her THC hearing, but she no longer does since she is now housed consistent with her gender identity.  See Def.'s 2d Resp. to Ct.

"When appropriate, district courts may redefine classes or subclasses sua sponte prior to certification." Borum v. Brentwood Vill., LLC, 324 F.R.D. 1, 8 (D.D.C. 2018) (citing Fed. R. Civ. P. 23(c)(5)).  To continue its analysis under Rule 23, then, the Court will redefine the class sua sponte as all transgender inmates who are or will be held in mandatory protective custody at intake under the H Policy.  This definition eliminates plaintiffs who could only raise claims against the now-superseded G Policy and focuses on the alleged injury arising out of the H Policy.[11]  Of course, this class must independently satisfy all requirements of Rule 23.  See, e.g., Marable v. Dist. Hosp. Partners, L.P., Civ. A. 01-02361 (HHK), 2006 WL 2547992, at *6 (D.D.C. Aug. 31, 2006) ("It is well settled that if subclasses are to be certified, each subclass must independently satisfy Federal Rule of Civil Procedure 23's requirements." (citing Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997))).

Before proceeding to the Rule 23 factors, though, the Court will briefly address the District's threshold argument that the putative class is "fatally overbroad" such that its members cannot even be ascertained.  See Def.'s Opp'n to Class Cert. at 6–7.  For one, the D.C. Circuit "has not addressed whether Rule 23 contains an ascertainability requirement for class certification." J.D., 925 F.3d at 1320.  And other courts in this district have commented that "[i]t is 'far from clear . . . that there exists in this district a requirement that a class certified under Rule 23(b)(2) must demonstrate ascertainability to merit certification.'"  O.A. v. Trump, 404 F. Supp. 3d 109, 159 (D.D.C. 2019) (quoting Ramirez v. U.S. Immig. & Customs Enf't, 338 F. Supp. 3d 1, 48 (D.D.C. 2018)).  But even assuming ascertainability is implicitly required as a prerequisite to class certification, it is easily satisfied by the class as (re-)defined by the Court.

---

[11] Plaintiff is free upon any renewed motion for class certification to modify this definition, bearing in mind that in order to be certified the proposed class must satisfy Rule 23 and conform with this opinion.

All that is required for a class to be ascertainable is that "an individual would be able to determine, simply by reading the [class] definition, whether he or she [is] a member of the proposed class." Coleman through Bunn v. District of Columbia, 306 F.R.D. 68, 75 (D.D.C. 2015) (alterations in original) (quoting Artis v. Yellen, 307 F.R.D. 13, 23 (D.D.C. 2014)). Ascertainability "is not designed to be a particularly stringent test," Brewer v. Lynch, Civ. A. No. 08-1747-BJR, 2015 WL 13604257, at *5 (D.D.C. Sept. 30, 2015) (quoting In re Rail Freight Fuel Surcharge Antitrust Litig., 287 F.R.D. 1, 29 (D.D.C. 2012), vacated on other grounds, 725 F.3d 244 (D.C. Cir. 2013)), and simply requires "that a class definition . . . render potential class members identifiable according to objective criteria," In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig., 422 F. Supp. 3d 194, 241 (D.D.C. 2019).

The District's ascertainability challenge regarding transgender inmates housed inconsistently with their gender identity, see Def.'s Opp'n to Class Cert. at 6–7, is now obsolete following the Court's exclusion of those individuals from the class definition. The District also asserts that future transgender inmates cannot be part of an ascertainable class because their "housing assignment will not be determined by the policy challenged in the [original] Complaint." Id. at 6. Because Hinton has since amended her complaint to explicitly challenge the alleged discrimination against transgender inmates under the H Policy, this objection falls flat for the same reasons the enactment of the H Policy does not moot the case. Future transgender inmates will be placed in protective custody at intake under the H Policy and are thus ascertainable as members of the class. The District's argument presumes that the H Policy is not subject to challenge, which, as discussed above, is incorrect.[12]

---

[12] Indeed, all of the cases cited by the District on this point found that ascertainability was satisfied. See In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig., 795 F.3d 380, 396–97 (3d Cir. 2015); Brewer, 2015 WL 13604257, at *5–8; Coleman, 306 F.R.D. at 75.

## I.   Numerosity

Having narrowed the class definition to only those transgender inmates who are or will be held in mandatory protective custody at intake under the H Policy, the Court "must ensure that [this] subclass satisfies [all] the requirements of Rule 23." Borum, 324 F.R.D. at 10 (citing D.L., 713 F.3d at 129).  Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  "There is no specific threshold that must be surpassed in order to satisfy the numerosity requirement; rather, the determination 'requires examination of the specific facts of each case and imposes no absolute limitations.'" Taylor v. D.C. Water & Sewer Auth., 241 F.R.D. 33, 37 (D.D.C. 2007) (quoting Gen. Tel. Co. of the Nw., Inc. v. EEOC, 446 U.S. 318, 330 (1980)); see also Coleman, 306 F.R.D. at 76 ("In assessing the number of potential class members, the Court need only find an approximation of the size of the class, not 'an exact number of putative class members.'" (quoting Pigford v. Glickman, 182 F.R.D. 341, 347 (D.D.C. 1998))).  Still, courts in this District have utilized some numerical guideposts to inform the 23(a)(1) inquiry, generally finding that "numerosity is satisfied when a proposed class has at least forty members," Coleman, 306 F.R.D. at 76 (quoting Richardson v. L'Oreal USA, Inc., 991 F. Supp. 2d 181, 196 (D.D.C. 2013)), and, "[a]t the lower-end, 'a class that encompasses fewer than 20 members will likely not be certified absent other indications of impracticability of joinder.'" Id. (quoting Newberg on Class Actions § 3:11 (5th ed. 2014)).  Ultimately, "'the Rule's core requirement is that joinder be impracticable' and numerosity merely 'provides an obvious situation in which joinder may be impracticable.'" Id. (quoting Newberg on Class Actions § 3:11). But the lack of a magic number test does not excuse a plaintiff from satisfying Rule 23's "rigorous analysis," which requires a plaintiff to "affirmatively demonstrate [her] compliance with the

Rule—that is, [she] must be prepared to prove that there are <u>in fact</u> sufficiently numerous parties." <u>Dukes</u>, 564 U.S. at 350–51.

Courts thus look to the facts of the case to determine the likely number of class members and the practicality of joinder, considering both quantitative data and qualitative factors such as "financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." <u>N.S. v. Hughes</u>, 335 F.R.D. 337, 352 (D.D.C. 2020) (quoting <u>D.L.</u>, 302 F.R.D. at 11), <u>modified on other grounds sub nom. N.S. v. Dixon</u>, 2020 WL 6701076 (D.D.C. Nov. 13, 2020). In any case, though, a plaintiff must support its assertions as to the number of class members with an evidentiary basis from which the Court may then "draw reasonable inferences from the facts presented to find the requisite numerosity." <u>Coleman</u>, 306 F.R.D. at 76 (quoting <u>McCuin v. Sec'y of Health & Hum. Servs.</u>, 817 F.2d 161, 167 (1st Cir. 1987)).

The District would have the Court make quick work of Hinton's proposed class, asserting that the number of putative class members identified in the record "falls far short of [the] threshold" requirement of "at least forty members," Def.'s Opp'n to Class Cert. at 7 (quoting <u>Cohen v. Chilcott</u>, 522 F. Supp. 2d 105, 114 (D.D.C. 2007)), and that the number of plaintiffs "will not grow in the future" because "all future transgender inmates will . . . not be subject to the challenged [G Policy]." <u>Id.</u> To begin, the District's "interpretation of [Rule 23(a)(1)] as a strict numerical threshold is incorrect." <u>See</u> <u>N.S.</u>, 335 F.R.D. at 352. Just because a class with forty identifiable members is <u>presumed</u> to satisfy Rule 23(a)(1), it does not follow that a plaintiff <u>must</u> identify forty class members to obtain class certification. <u>See, e.g.</u>, <u>Coleman</u>, 306 F.R.D. at 79 ("Even if . . . the Court were considering a class of 30 members, the Court would find that joinder was . . . impracticable."). Nor is the Court persuaded by the District's argument as to the nonexistence of

future plaintiffs. Once again, the District presupposes that the proposed class does not challenge the H Policy, which is clearly not the case. See Am. Compl. ¶¶ 57–63. The District's argument that no future plaintiffs exist thus "'put[s] the cart before the horse,' by asking how many successful class members exist, rather than how many potential class members exist." Coleman, 306 F.R.D. at 77 (quoting Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 460 (2013)). The District is thus incorrect, and the Court must instead count—or rather, estimate based on evidence in the record—the likely number of transgender inmates who are or will be subject to DOC's allegedly discriminatory use of protective custody at intake under the H Policy.

Hinton counters that over forty current class members exist based on the declaration of defense attorney Deborah Golden "that between 40 and 60 transgender people currently reside in" DOC facilities. See Pl.'s Mot. for Class Cert. at 5 (citing Golden Decl. ¶¶ 1, 3). Golden, in turn, arrived at her estimate by applying the estimated proportion of transgender residents in D.C. to the total population in DOC custody. See Golden Decl. ¶ 3. The District states that Golden's extrapolation is wrong and that "only eight transgender inmates . . . reside[d] in DOC facilities" as of June 18. Def.'s Opp'n to Class Cert. at 7 (citing Decl. of Charles Akinboyewa ("Akinboyewa Decl.") [ECF No. 22-3] ¶ 7). Because the District is in a better position to provide precise data on the individuals in DOC custody, the Court credits its factual assertions on the number of transgender inmates as of June 18 and thus will not rely on Golden's statistically derived estimate. See Nat'l Sec. Counsel. v. CIA, 316 F.R.D. 5, 7–8 (D.D.C. 2012) (crediting defendant's numerical assertions on information within its control to reject plaintiffs' numerical estimate of class size). But the analysis does not end there.

Hinton also contends that "[f]actoring in the untold number of future transgender residents who will be housed based on DOC's policy makes the class size much larger" than the current

transgender population in DOC custody.  Pl.'s Mot. for Class Cert. at 6.  Unfortunately, plaintiff has not provided much evidence suggesting that this "untold number" will be "so numerous" as to satisfy Rule 23(a)(1).  The record gives only snapshots of DOC's transgender population taken at different moments since this lawsuit was filed.  As of June 1, there were six transgender inmates in DOC custody; one was released on June 9, and by June 18, when the District filed its opposition to class certification, three more transgender individuals had been taken into custody.  See Akinboyewa Decl. ¶¶ 5–7.  That makes nine so far.  Over the next two months, the District reports that only one additional transgender inmate was committed to DOC custody.  See Def.'s Resp. to Ct. at 3.  Adding Hinton, who was released on May 26, that makes eleven total transgender individuals in DOC custody at some point over the course of this litigation.[13]

Beyond the numbers provided by the District, the record in this case provides scant additional historical data on DOC's transgender population.  For instance, in addition to her statistical extrapolation, Golden states that she has represented ten to twenty transgender individuals in DOC custody over her career spanning some twenty-one years.  Golden Decl. ¶ 2.  Another defense attorney, Tara Chen, submitted a declaration that she had consulted with other attorneys "about approximately five transgender clients" during her six-year tenure at the Public Defender Service of D.C.  See Chen Decl. ¶¶ 1–2.  It is unclear whether any of those consultations were with Golden, which would create an overlap in the two sets of estimates.  But although the Court credits these anecdotal reports and recognizes that they do not provide the full picture of transgender inmates in D.C., they still do not constitute sufficient data to move the needle in the Court's numerosity analysis.

---

[13] To be clear, these eleven individuals are not being counted as "class members."  Instead, the Court is looking back at the number of transgender individuals who have passed through DOC custody in order to inform its prospective determination whether a sufficiently numerous class—made up largely of future claimants—exists.

Public sources are similarly unhelpful in identifying solid numerical trends describing the transgender population in DOC custody.  For example, when DOC instituted an earlier iteration of reforms to its transgender housing policies, the <u>Washington City Paper</u> reported without attribution that "as many as 20 trans women are housed in the D.C. Jail at any given time, [but] the population of trans men goes unreported."  Amanda Hess, <u>Trans Slammer: Are D.C.'s Transgender Inmates Still Screwed?</u>, Wash. City Paper (Mar. 4, 2009), https://washingtoncitypaper.com/article/396077/trans-slammer-are-dcs-transgender-inmates-still-screwed; <u>see also</u> <u>id.</u> (quoting "Pamela, 42, [who] has . . . made 'seven to eight' trips" to the D.C. Jail "over the past 10 years").  There have also been at least two other federal lawsuits filed by transgender inmates in DOC custody in the past five years, <u>see</u> <u>Richardson v. District of Columbia</u>, 322 F. Supp. 3d 175 (D.D.C. 2018); <u>Doe v. District of Columbia</u>, 215 F. Supp. 3d 62 (D.D.C. 2016), but neither of those suits provided detailed numbers for the DOC-wide transgender population  As with plaintiff's proffered evidence, these sources fail to provide the type of evidentiary basis that has supported an inference of future numerosity in other cases.  In all, the record, plus the little data available from public sources, merely establishes that eleven transgender inmates have been in DOC custody at some point between May and August 2021, and that some unknown number of transgender individuals have been committed to DOC custody in the past.

This is not enough to satisfy Rule 23's "rigorous analysis."  Hinton relies heavily on the D.C. Circuit's ruling in <u>J.D. v. Azar</u> to make her case for numerosity, but a brief examination of that case demonstrates why it cannot compel certification here.  There, the district court certified a class consisting of "pregnant unaccompanied minors who are or will be in [Office of Refugee Resettlement ("ORR")] custody" who sought to enjoin the government from denying class members access to abortions.  <u>J.D.</u>, 925 F.3d at 1322.  On appeal, the government argued that only

the subset of pregnant minors who actually <u>sought</u> abortions should be included in the class, and that such a narrowing would defeat numerosity because only eighteen minors in ORR custody had requested abortions over the preceding year.  <u>Id.</u>  The D.C. Circuit rejected the government's proposed narrower class definition, and in dicta, the court stated that even the narrower class would not necessarily falter on numerosity grounds.  But with respect to the actual class certified by the district court, it was undisputed that "[e]ach year, ORR ha[d] <u>several hundred</u> pregnant unaccompanied minors in its custody," <u>id.</u> at 1303 (emphasis added), and the government "[did] not argue that there [was] any numerosity problem with the class certified by the district court," <u>id.</u> at 1322.  Hence, there was no "need" to "decide whether a narrowed class" as pressed by the government "would satisfy the numerosity standard."  <u>Id.</u> at 1323.  And the court's rumination that "classes including future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them,'" <u>id.</u> at 1322 (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:15 (5th ed. 2018)), was dictum and must be understood in context.[14]

Other courts that have certified classes of largely future claimants in "fluid" carceral settings have likewise based their numerosity determinations on greater numbers supported by more evidence.  For example, the court in <u>N.S. v. Hughes</u>, another case cited by Hinton, found that numerosity was satisfied by a class of criminal defendants who were detained in D.C. Superior

---

[14] None of the cases cited by the D.C. Circuit in <u>J.D.</u> as classes "certified in like circumstances" with "fewer than 20 members" changes the Court's analysis.  925 F.3d at 1323 (citing <u>Jackson v. Danberg</u>, 240 F.R.D. 145, 147–48 (D. Del. 2007) (16 members); <u>Bublitz v. E.I. du Pont de Nemours & Co.</u>, 202 F.R.D. 251, 255–56 (S.D. Iowa 2001) (17 members); <u>Gaspar v. Linvatec Corp.</u>, 167 F.R.D. 51, 55–57 (N.D. Ill. 1996) (18 members); <u>Manning v. Princeton Consumer Disc. Co., Inc.</u>, 390 F. Supp. 320, 324–25 (E.D. Pa. 1975) (15 members), <u>aff'd</u>, 533 F.2d 102 (3d Cir. 1976); <u>see also Clarkson v. Coughlin</u>, 145 F.R.D. 339, 348 (S.D.N.Y. 1993) (numerosity satisfied for sub-class where plaintiff identified "at least seven deaf or hearing-impaired female inmates" because "the composition of the prison population is inherently 'fluid'").  With the exception of the seven-person sub-class in <u>Clarkson</u>, where the total class was undisputedly numerous enough to warrant class treatment in any event, these close-call cases all had larger and more concrete numbers to work from.  Moreover, they all predate more recent Supreme Court cases holding plaintiffs to a more rigorous burden at the class-certification stage.  <u>E.g.</u>, <u>Wal-Mart</u>, 564 U.S. at 350; <u>Comcast Corp. v. Behrend</u>, 569 U.S. 27, 33–34 (2013).

Court by the U.S. Marshals Service for suspected civil immigration violations despite having no valid deportation orders against them. 335 F.R.D. at 342–43, 352–53. Judge Lamberth relied on evidence that Immigration and Customs Enforcement sent an average of 125 detainer orders per year to D.C. Superior Court over the preceding two years, as well as on attorney affidavits stating that forty individuals meeting the class definition had been identified over the preceding three-year period, all of which "suggest[ed] that the proposed class [was] likely quite sizeable" even though plaintiff "[did] not establish an exact number of class members." Id. The attorney affidavits submitted here, by contrast, provide much smaller numbers. Similarly, in D.L. v. District of Columbia, even though the court discussed non-numerical qualitative factors making joinder impracticable, it also found that "[i]n just the limited timeframe [identified by plaintiffs], every subclass far exceed[ed] the threshold number of 40." 302 F.R.D. at 11. While Hinton is correct that this Court should consider nonnumerical factors affecting the practicality of joinder, the Court is not convinced that it may simply forego the numerical analysis altogether.

This is especially so where, as here, class certification is necessary to avoid dismissal on mootness grounds. To meet the inherently transitory exception to mootness, "some class members [must] retain a live claim at every stage of litigation." J.D., 925 F.3d at 1311. If the class is only sparsely and sporadically populated by individuals with live claims—which seems likely based on the fact that only one transgender inmate entered DOC custody between mid-June and mid-August—it becomes more difficult for the Court to find that the inherently transitory exception will be satisfied.

In sum, the record cannot support an inference of a sufficiently numerous class. That is not to say, however, that plaintiff could not marshal additional evidence to support such an inference through a renewed motion for class certification. Even acknowledging the scarcity of

precise figures measuring the transgender population in DOC custody over time, see Pl.'s Reply at 17, plaintiff has not even attempted to seek pre-certification discovery to assess the District's records. Moreover, both local press and local LBGTQ non-profit organizations have been expressing interest in the prison conditions for transgender individuals in the District of Columbia for over a decade. See, e.g., Hess, supra. The Court is thus inclined to provide one more opportunity for plaintiff to renew her motion in order to substantiate the sufficiently numerous class she asserts exists.

This conclusion is bolstered by the fact that the non-numerical factors affecting the impracticability of joinder would militate in favor of certification if plaintiff demonstrated a sufficiently numerous class. For example, the population in DOC custody is fluid and unpredictable. See, e.g., J.D., 925 F.3d at 1322 (noting that "the fluidity of ORR custody" was a factor "that might make joinder impracticable"). And although the period of gender-based protective custody at intake mandated under the H Policy may be long enough to raise constitutional concerns, it is generally not long enough for future transgender inmates to learn about and join this lawsuit or to file and adjudicate claims of their own while at intake. See D.L., 302 F.R.D. at 11 (certification favored where "pursuit of individual actions on behalf of the class members would be impracticable"). Indeed, the structural constraints on challenges of this type may make this case one in which DOC's "actions are essentially unreviewable without a class action, as no detainee could litigate his or her claim" during the few days he or she is held in protective custody at intake, "mak[ing] joinder not just impracticable, but impossible." N.S., 335 F.R.D. at 353.

Transgender inmates are uniquely vulnerable as a group, which also militates in favor of class treatment. See Coleman, 306 F.R.D. at 80, 82 ("[T]he vulnerability of many members of the

class renders their claims uniquely unsuited for individual prosecution.").[15]  For one, they are

likely to lack financial resources to press individual claims.  See Elijah Adiv Edelman et al., D.C.

Trans Coal., Access Denied: Washington, DC Trans Needs Assessment Report 6 (2015),

https://dctranscoalition.files.wordpress.com/2015/11/dctc-access-denied-final.pdf  (finding  that

over 46% of transgender District residents—and 57% of transgender women of color—make less

than $10,000 a year, compared to only 11% of District residents overall).  "In such situations, a

putative class action may present 'an example of the economic reality that petitioner's suit must

proceed as a class action or not at all.'"  Coleman, 306 F.R.D. at 80 (quoting D.L., 302 F.R.D. at

11); accord, e.g., N.S., 335 F.R.D. at 353 ("[T]he proposed class is limited to indigents, meaning

that bringing individual suits would be extremely difficult.").  Moreover, "[f]orty-four percent of

transgender individuals experience some form of mistreatment by law enforcement," which "can

cause distrust of anyone affiliated with law enforcement," including lawyers and courts.  Golden

Decl.  ¶  4  (citing  Nat'l  Ctr.  for  Transgender  Equal.,  2015  U.S.  Transgender  Survey,

https://transequality.org/sites/default/files/docs/usts/USTSDCReport(1017).pdf).  It is plausible,

then, that in light of these additional vulnerabilities, transgender inmates are less likely to stick out

their necks and join or commence litigation to challenge their conditions of confinement and

vindicate their constitutional rights.

Nonetheless, "[i]t is clear beyond cavil that the '[f]ailure to meet any of Rule 23(a) or

23(b)'s requirements precludes certification.'"  Parker v. Bank of Am., N.A., 99 F. Supp. 3d 69,

89–90 (D.D.C. 2015) (quoting Danvers Motor Co. v. Ford Motor Co., 543 F.3d 141, 147 (3d Cir.

2008)).  Hinton has not met her burden to establish a sufficiently numerous class, so the Court

---

[15] In assessing the vulnerability of class members as it relates to their ability to join an individual lawsuit, "courts discussing a class's vulnerability regularly make inferences that flow logically from the class definition." Coleman, 306 F.R.D. at 81 (citing McDonald v. Heckler, 612 F. Supp. 293, 300 (D. Mass. 1985)).

must deny her motion for class certification.  But it will do so without prejudice so as to permit her to renew her motion if she can develop a stronger record.  To that end, plaintiff may seek pre-certification discovery.  See, e.g., Smith v. Ergo Sols., LLC, 306 F.R.D. 57, 68 (D.D.C. 2015) ("[T]he Court will deny class certification at this time, but finds that pre-certification discovery is warranted."); Burton v. District of Columbia, 277 F.R.D. 224, 230 (D.D.C. 2011) ("Often the pleadings alone will not resolve the question of class certification and some discovery will be warranted." (cleaned up) (citation omitted)).  Having determined that Hinton's motion for class certification fails on numerosity grounds, "this Court need not proceed to address each of the other certification requirements."  Parker, 99 F. Supp. 3d at 90 (citing Wal-Mart, 564 U.S. at 349 n.5).

### Preliminary Injunction

Because the Court will deny Hinton's motion for class certification, it must assess her motion for a preliminary injunction on an individual basis.  See C.G.B. v. Wolf, 464 F. Supp. 3d 174, 198 (D.D.C. 2020) ("Finding that the current Plaintiffs have not established grounds to certify a class or to add additional parties to the litigation, the Court will limit its consideration of the merits of injunctive relief to the named Plaintiffs.").  Further, as the Court has already detailed, Hinton's individual claim against the G Policy is rendered moot by the enactment of the H Policy.  Hence, the Court's preliminary injunction analysis is limited to Hinton's individual challenge against the H Policy's use of mandatory protective custody at intake.

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  Before a preliminary injunction may issue, a plaintiff "must make a 'clear showing' that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in [her] favor, and accord with the public interest."  Pursuing Am.'s Greatness v. FEC,

831 F.3d 500, 505 (D.C. Cir. 2016) (quoting <u>Winter</u>, 555 U.S. at 22).  But not all of the four factors weigh equally in a district court's preliminary injunction analysis: "failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006); <u>accord</u> <u>E.B. v. U.S. Dep't of State</u>, 422 F. Supp. 3d 81, 86 (D.D.C. 2019) ("[I]t is clear that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat the motion [for preliminary injunction]." (quoting <u>Navajo Nation v. Azar</u>, 292 F. Supp. 3d 508, 512 (D.D.C. 2018)).

The Court's analysis begins and ends with Hinton's failure to meet the high bar for showing irreparable harm on an individual basis absent the requested injunctive relief.  The Supreme Court has held that "[i]ssuing a preliminary injunction based only on a <u>possibility</u> of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." <u>Winter</u>, 555 U.S. at 22 (emphasis added) (citing <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997) (per curiam)). Consistent with this mandate, the D.C. Circuit in particular "has set a high standard for irreparable injury.  First, the injury 'must be both certain and great; it must be actual and not theoretical.' . . . . Second, the injury must be beyond remediation." <u>Full Gospel Churches</u>, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting <u>Wisc. Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).

Even if Hinton has established a possibility that she will be harmed by the H Policy absent an injunction, her prospective injury is not "certain and great."  As an individual, Hinton's theory of irreparable harm rests largely on the possibility that she will be shackled while under protective custody in the intake unit.  At the hearing on this motion, plaintiff's counsel directed the Court to "look at . . . what is hanging over Ms. Hinton's head. . . .  [S]he knows if she returns to custody,

she will be shackled under this policy." Hr'g Tr. at 54:20–22; see also id. at 21:10–16 ("[Y]ou could strip away the rest of it and look at the shackling alone, and you would have irreparable harm."). But that is a big "if." Hinton faces "allegations of unarmed burglary with the intent to steal twenty dollars." Pl.'s Br. at 4 (citing Decl. of Rachel Cicurel [ECF No. 4-9] ¶ 3). The D.C. Superior Court judge overseeing Hinton's criminal prosecution already saw fit to release her from custody while awaiting trial, see Notice (May 27, 2021), and no evidence has been submitted indicating the likelihood—much less a certainty—that she will be incarcerated further on this charge. Even if she were to be sentenced to further incarceration, it is not clear that Hinton would actually be shackled under the H Policy: she has already been through the THC process and housed in the women's unit. Her recent history with DOC thus suggests that her initial PREA screening "may well result in a determination that protective custody for the remainder of intake . . . is unnecessary" in her case. See Def.'s Surreply at 9. Nor is it surprising that Hinton is unable to clear the high bar for showing irreparable harm in the absence of a certified class: she concedes that "[c]lass certification is important to [her] case for injunctive relief because it strengthens the showing on irreparable harm." See Pl.'s Resp. to Ct.'s Questions [ECF No. 35] at 3. Having failed to make such a showing on an individual basis, the Court will deny Hinton's motion for preliminary injunction.

## Conclusion

For the foregoing reasons, the Court concludes that all claims against the superseded G Policy are moot and must be dismissed. Relatedly, current transgender inmates housed inconsistent with their gender identity lack any viable connection with the remaining claims in this case and may not be included in the class definition. The Court will deny Hinton's motion for class certification for failure to satisfy Rule 23(a)(1)'s numerosity requirement, but it will do so

without prejudice in order to permit her to renew her motion.  Meanwhile, Hinton may seek pre-certification discovery in order to augment the record for a renewed motion.  Absent a viable class at this point, however, Hinton's motion for a preliminary injunction will be denied.  A separate Order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated:  September 30, 2021